Opinion of
 

 the court.
 

 At the last term on the affidavits then read and filed with the clerk, a rule was granted in this case, requiring the secretary of state to shew cause why a mandamus
 
 *154
 
 should not issue, directing him to deliver to William Marbury his commission as a justice of the peace for the county of Washington in the district of Columbia.
 

 No cause has been shewn, and the present motion is for a mandamus. The peculiar delicacy of this case, the novelty of some of its circumstances, and the real difficulty attending the points which occur in it, require a complete exposition of the principles, on which the opinion to be given by the court, is founded.
 

 These principles have been, on the side of the applicant, very ably argued at the bar. In rendering the opinion of the court, there will be some departure in form, though not in substance, from the points stated in that argument.
 

 In the order in which the court has viewed this subject, the following questions have been considered and decided.
 

 1st. Has the applicant a right to the commission he demands ?
 

 2dly. If he has a right, and that right has been violated, do the laws of his country afford him a remedy?
 

 3dly. If they do afford him a remedy, is it a
 
 mandamus
 
 issuing from this court?
 

 The first object of enquiry is,
 

 1st. Has the applicant a right to the commission he demands?
 

 His right originates in an act of congress passed in February 1801, concerning the district of Columbia.
 

 After dividing the district into two counties, the 11th section of this law, enacts, “ that there shall be appointed in and for each of the said counties, such number of discreet persons to be justices of the peace as the president of the United States shall, from time to time, think expedient, to continue in office for five years.
 

 
 *155
 
 It appears, from the affidavits, that in compliance with this law, a commission for William Marbury as justice of peace for the country of Washington, was signed by John Adams, then president of the United States; after which the seal of the United States was affixed to it; but the commission has never reached the person for whom it was made out.
 

 In order to determine whether he is entitled to this commission, it becomes necessary to enquire whether he has been appointed to the office. For if he has been appointed, the law continues him in office for five years, and he is entitled to the possession of those evidences of office, which, being completed, became his property.
 

 The 2d section of the 2d article of the constitution, declares, that, “ the president shall nominate, and, by “ and with the advice and consent of the senate, shall “ appoint ambassadors, other public ministers and consuls, “ and all other officers of the United States, whose ap- “ pointments are not otherwise provided for.”
 

 The third section declares, that “ he shall commission “ all the officers of the United States.”
 

 An act of congress directs the secretary of state to keep the seal of the United States, “ to make out and record, and affix the said seal to all civil commissions to officers of the United States, to be appointed by the President, by and with the
 
 consent
 
 of the senate, or by the President alone; provided that the said seal shall not be affixed to any commission before the same shall have been signed by the President of the United States.”
 

 These are the clauses of the constitution and laws of the United States, which affect this part of the case. They seem to contemplate three distinct operations:
 

 1st, The nomination. This is the sole act of the President, and is completely voluntary.
 

 2d. The appointment. This is also the act of the President, and is also a voluntary act, though it can only be performed by and with the advice and consent of the senate.
 

 
 *156
 
 3d. The commission. To grant a commission to a person appointed, might perhaps be deemed a duty enjoined by the constitution. " He shall," says that instrument, " commission all the officers of the United States."
 

 The acts of appointing to office, and commissioning the person appointed, can scarcely be considered as one and the same; since the power to perform them is given in two separate and distinct sections of the constitution. The distinction between the appointment and the commission will be rendered more apparent, by adverting to that provision in the second section of the second article of the constitution, which authorizes congress " to vest, by law, the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments ;" thus contemplating cases where the law may direct the President to commission an officer appointed by the courts, or by the heads of departments. In such a case, to issue a commission would be apparently a duty distinct from the appointment, the performance of which, perhaps, could not legally be refused.
 

 Although that clause of the constitution which requires the President to commission all the officers of the United States, may never have been applied to officers appointed otherwise than by himself, yet it would be difficult to deny the legislative power to apply it to such cases. Of consequence the constitutional distinction between the appointment to an office and the commission of an officer, who has been appointed, remains the same as if in practice the President had commissioned officers appointed by an authority other than his own.
 

 It follows too, from the existence of this distinction, that, if an appointment was to be evidenced by any public act, other than the commission, the performance of such public act would create the officer; and if he was not removeable at the will of the President, would either give him a right to his commission, or enable him to perform the duties without it.
 

 These observations are premised solely for the purpose of rendering more intelligible those which apply more directly to the particular case under consideration.
 

 
 *157
 
 This is an appointment made by the President, by and with the advice and consent of the senate, and is evidenced by no act but the commission itself. In such a case therefore the commission and the appointment seem inseparable; it being almost impossible to shew an appointment otherwise than by proving the existence of a commission; still the commission is not necessarily the appointment ; though conclusive evidence of it.
 

 But at what stage does it amount to this conclusive evidence ?
 

 The answer to this question seems an obvious one. The appointment being the sole act of the President, must be completely evidenced, when it is shewn that he has done every thing to be performed by him.
 

 Should the commission, instead of being evidence of an appointment, even be considered as constituting the appointment itself; still it would be made when the last act to be done by the President was performed, or, at furthest, when the commission was complete.
 

 The last act to be done by the President, is the signature of the commission. He has then acted on the advice and consent of the senate to his own nomination. The time for deliberation has then passed. He has decided. His judgment, on the advice and consent of the senate concurring with his nomination, has been made, and the officer is appointed. This appointment is evidenced by an open, unequivocal act; and being the last act required from the person making it, necessarily excludes the idea of its being, so far as respects the appointment, an inchoate and incomplete transaction.
 

 Some point of time must be taken when the power of the executive over an officer, not removeable at his will, must cease. That point of time must be when the constitutional power of appointment has been exercised. And this power has been exercised when the last act, required from the person possessing the power, has been performed. This last act is the signature of the commission. This idea seems to have prevailed with the legislature, when the act passed, converting the department
 
 *158
 
 of foreign affairs into the department of state. By that act it is enacted, that the secretary of state shall keep that seal of the United States, and shall make out and re- " cord, and shall affix the said seal to all civil commissions “ to officers of the United States, to be appointed by the “ President:" "Provided that the said seal shall not be af- “ fixed to any commission, before the same shall have been “ signed by the President of the United States; nor to “ any other instrument or act, without the special war- “ rant of the President therefor.”
 

 The signature is a warrant for affixing the great seal to the commission; and the great seal is only to be affixed to an instrument which is complete. It attests, by an act supposed to be of public notoriety, the verity of the Presidential signature.
 

 It is never to be affixed till the commission is signed, because the signature, which gives force and effect to the commission, is conclusive evidence that the appointment is made.
 

 The commission being signed, the subsequent duty of the secretary of state is prescribed by law, and not to be guided by the will of the President. He is to affix the seal of the United States to the commission, and is to record it.
 

 This is not a proceeding which may be varied, if the judgment of the executive shall suggest one more eligible; but is a precise course accurately marked out by law, and is to be strictly pursued. It is the duty of the secretary of state to conform to the law, and in this he is an officer of the United States, bound to obey the laws. He acts, in this respect, as has been very properly stated at the bar, under the authority of law, and not by the instructions of the President. It is a ministerial act which the law enjoins on 3 particular officer for a particular purpose.
 

 If it should be supposed, that the solemnity of affixing the seal, is necessary not only to the validity of the commission, but even to the completion of an appointment, still when the seal is affixed the appointment is made, and
 
 *159
 
 the commission is valid. No other solemnity is required by law ; no other act is to be performed on the part of government. All that the executive can do to invest the person with his office, is done; and unless the appointment be then made, the executive cannot make one without the co-operation of others.
 

 After searching anxiously for the principles on which a contrary opinion may be supported, none have been found which appear of sufficient force to maintain the opposite doctrine.
 

 Such as the imagination of the court could suggest, have been very deliberately examined, and after allowing them all the weight which it appears possible to give them, they do not shake the opinion which has been formed.
 

 In considering this question, it has been conjectured that the commission may have been assimilated to a deed, to the validity of which, delivery is essential.
 

 This idea is founded on the supposition that the commission is not merely
 
 evidence
 
 of an appointment, but is itself the actual appointment; a supposition by no means unquestionable. But for the purpose of examining this objection fairly, let it be conceded, that the principle, claimed for its support, is established.
 

 The appointment being, under the constitution, to be made by the President
 
 personally,
 
 the delivery of the deed of appointment, if necessary to its completion, must be made by the President also. It is not necessary that the livery should be made personally to the grantee of the office : It never is so made. The law would seem to contemplate that it should be made to the secretary of state, since it directs the secretary to affix the seal to the commission
 
 after
 
 it shall have been signed by the President. If then the act of livery be necessary to give validity to the commission, it has been delivered when executed and given to the secretary for the purpose of being sealed, recorded, and transmitted to the party.
 

 But in all cases of letters patent, certain solemnities are required by law, which solemnities are the evidences
 
 *160
 
 of the validity of the instrument. A formal delivery to the person is not among them. In cases of commissions, the sign manual of the President, and the seal of the United States, are those solemnities. This objection therefore does not touch the case.
 

 It has also occurred as possible, and barely possible, that the transmission of the commission, and the acceptance thereof, might be deemed necessary to complete the right of the plaintiff.
 

 The transmission of the commission, is a practice directed by convenience, but not by law. It cannot therefore be necessary to constitute the appointment which must precede it, and which is the mere act of the President. If the executive required that every person appointed to an office, should himself take means to procure his commission, the appointment would not be the less valid on that account. The appointment is the sole act of the President; the transmission of the commission is the sole act of the officer to whom that duty is assigned, and may be accelerated or retarded by circumstances which can have no influence on the appointment. A commission is transmitted to a person already appointed ; not to a person to be appointed or not, as the letter enclosing the commission should happen to get into the post-office and reach him in safety, or to miscarry.
 

 It may have some tendency to elucidate this point, to enquire, whether the possession of the original commission be indispensably necessary to authorize a person, appointed to any office, to perform the duties of that office. If it was necessary, then a loss of the commission would lose the office. Not only negligence, but accident or fraud, fire or theft, might deprive an individual of his office. In such a case, I presume it could not be doubted, but that a copy from the record of the office of the secretary of state, would be, to every intent and purpose, equal to the original. The act of congress has expressly made it so. To give that copy validity, it would not be necessary to prove that the original had been transmitted and afterwards lost. The copy would be complete evidence that the original had existed, and that the appointment had been made, but, not that the original had been transmitted. If indeed it should appear that
 
 *161
 
 the original had been mislaid in the office of state, that circumstance would not affect the operation of the copy. When all the requisites have been performed which authorize a recording officer to record any instrument whatever, and the order for that purpose has been given, the instrument is, in law, considered as recorded, although the manual labour of inserting it in a book kept for that purpose may not have been performed.
 

 In the case of commissions, the law orders the secretary of state to record them. When therefore they are signed and sealed, the order for their being recorded is given; and whether inserted in the book or not, they are in law recorded.
 

 A copy of this record is declared equal to the original, and the fees, to be paid by a person requiring a copy, are ascertained by law. Can a keeper of a public record, erase therefrom a commission which has been recorded ? Or can he refuse a copy thereof to a person demanding it on the terms prescribed by law ?
 

 Such a copy would, equally with the original, authorize the justice of peace to proceed in the performance of his duty, because it would, equally with the original, attest his appointment.
 

 If the transmission of a commission be not considered as necessary to give validity to an appointment; still less is its acceptance. The appointment is the sole act of the President; the acceptance is the sole act of the officer, and is, in plain common sense, posterior to the appointment. As he may resign, so may he refuse to accept : but neither the one, nor the other, is capable of rendering the appointment a non-entity.
 

 That this is the understanding of the government, is apparent from the whole tenor of its conduct.
 

 A commission bears date, and the salary of the officer commences from his appointment; not from the transmission or acceptance of his commission. When a person, appointed to any office, refuses to accept that office, the successor is nominated in the place of the person who
 
 *162
 
 has declined to accept, and not in the place of the person who had been previously in office, and had created the original vacancy.
 

 It is therefore decidedly the opinion of the court, that when a commission has been signed by the President, the appointment is made ; and that the commission is complete, when the seal of the United States has been affixed to it by the secretary of state.
 

 Where an officer is removeable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removeable at the will of the executive, the appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed.
 

 The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated in all cases, where, by law, the officer is not removeable by him. The right to the office is
 
 then
 
 in the person appointed, and he has the absolute, unconditional, power of accepting or rejecting it.
 

 Mr. Marbury, then, since his commission was signed by the President, and sealed by the secretary of state, was appointed; and as the law creating the office, gave the officer a right to hold for five years, independent of the executive, the appointment was not revocable; but vested in the officer legal rights, which are protected by the laws of his country.
 

 To withhold his commission, therefore, is an act deemed by the court not warranted by law, but violative of a vested legal right.
 

 This brings
 
 us
 
 to the second enquiry
 
 ;
 
 which is,
 

 2dly. If he has a right, and that right has been violated, do the laws of his country afford him a remedy?
 

 
 *163
 
 The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.
 

 In the 3d vol. of his commentaries, p. 23, Blackstone states two cases in which a remedy is afforded by mere operation of law.
 

 “In all other cases,” he says, “it is a general and indis-“putable rule, that where there is a legal right, there is “ also a legal remedy by suit or action at law, whenever “that right is invaded.”
 

 And afterwards, p. 109, of the same vol. he says, “I "am next to consider such injuries as are cognizable by “the courts of the common law. And herein I shall for "the present only remark, that all possible injuries what-"soever, that did not fall within the exclusive cognizance “of either the ecclesiastical, military, or maritime tribu-"nals, are for that very reason, within the cognizance "of the common law courts of justice; for it is a settled "and invariable principle in the laws of England, that "every right, when withheld, must have a remedy, and “every injury its proper redress.”
 

 The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.
 

 If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case.
 

 It behoves us then to enquire whether there be in its composition any ingredient which shall exempt it from legal investigation, or exclude the injured party from legal redress. In pursuing this enquiry the first question which presents itself, is, whether this can be arranged
 
 *164
 
 with that class of cases which come under the description of
 
 damnum absque
 
 injuria—a loss without an injury.
 

 This description of cases never has been considered, and it is believed never can be considered, as comprehending offices of trust, of honor or of profit. The office of justice of peace in the district of Columbia is such an office; it is therefore worthy of the attention and guardianship of the laws. It has received that attention and guardianship. It has been created by special act of congress, and has been secured, so far as the laws can give security to the person appointed to fill it, for five years. It is not then on account of the worthlessness of the thing pursued, that the injured party can be alleged to be without remedy.
 

 Is it in the nature of the transaction ? Is the act of delivering or withholding a commission to be considered as a mere political act, belonging to the executive department alone, for the performance of which, entire confidence is placed by our constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy.
 

 That there may be such cases is not to be questioned; but that every act of duty, to be performed in any of the great departments of government, constitutes such a case, is not to be admitted.
 

 By the act concerning invalids, passed in June, 1794, vol. 3. p. 112, the secretary at war is ordered to place on the pension list, all persons whose names are contained in a report previously made by him to congress. If he should refuse to do so, would the wounded veteran be without remedy ? Is it to be contended that where the law in precise terms, directs the performance of an act, in which an individual is interested, the law is incapable of securing obedience to its mandate ? Is it on account of the character of the person against whom the complaint is made ? Is it to be contended that the heads of departments are not amenable to the laws of their country ?
 

 Whatever the practice on particular occasions may be, the theory of this principle will certainly never be main
 
 *165
 
 tained. No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law. After stating that personal injury from the king to a subject is presumed to be impossible, Blackstone, vol. 3. p. 255, says, “but injuries “to the rights of property can scarcely be committed by “the crown without the intervention of its officers; for "whom, the law, in matters of right, entertains no re-“spect or delicacy; but furnishes various methods of de-"tecting the errors and misconduct of those agents, by "whom the king has been deceived and induced to do a “temporary injustice.”
 

 By the act passed in 1796, authorising the sale of the lands above the mouth of Kentucky river (vol. 3d. p. 2991 the purchaser, on paying his purchase money, becomes completely entitled to the property purchased; and on producing to the secretary of state, the receipt of the treasurer upon a certificate required by the law, the president of the United States is authorised to grant him a patent. It is further enacted that all patents shall be countersigned by the secretary of state, and recorded in his office. If the secretary of state should choose to withhold this patent; or the patent being lost, should refuse a copy of it; can it be imagined that the law furnishes to the injured person no remedy?
 

 It is not believed that any person whatever would attempt to maintain such a proposition.
 

 It follows then that the question, whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend on the nature of that act.
 

 If some acts be examinable, and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction.
 

 In some instances there may be difficulty in applying the rule to particular cases; but there cannot, it is believed, be much difficulty in laying down the rule.
 

 By the constitution of the United States, the President is invested with certain important political powers, in the
 
 *166
 
 exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.
 

 In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts.
 

 But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others.
 

 The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.
 

 If this be the rule, let us enquire how it applies to the case under the consideration of the court.
 

 
 *167
 
 The power of nominating to the senate, and the power of appointing the person nominated, are political powers, to be exercised by the President according to his own discretion. When he has made an appointment, he has exercised his whole power, and his discretion has been completely applied to the case. If, by law, the officer be removable at the will of the President, then a new appointment may be immediately made, and the rights of the officer are terminated. But as a fact which has existed cannot be made never to have existed, the appointment cannot be annihilated; and consequently if the officer is by law not removable at the will of the President; the rights he has acquired are protected by the law, and are not resumable by the President. They cannot be extinguished by executive authority, and he has the privilege of asserting them in like manner as if they had been derived from any other source.
 

 The question whether a right has vested or not, is, in its nature, judicial, and must be tried by the judicial authority. It, for example, Mr. Marbury had taken the oaths of a magistrate, and proceeded to act as one; in consequence of which a suit had been instituted against him, in which his defence had depended on his being a magistrate; the validity of his appointment must have been determined by judicial authority.
 

 So, if he conceives that, by virtue of his appointment, he has a legal right, either to the commission which has been made out for him, or to a copy of that commission, it is equally a question examinable in a court, and the decision of the court upon it must depend on the opinion entertained of his appointment.
 

 That question has been discussed, and the opinion is, that the latest point of time which can be taken as that at which the appointment was complete, and evidenced, was when, after the signature of the president, the seal of the United States was affixed to the commission.
 

 It is then the opinion of the court,
 

 1st. That by signing the commission of Mr. Marbury, the president of the United States appointed him a justice
 
 *168
 
 of peace, for the county of Washington in the district of Columbia; and that the seal of the United States, affixed thereto by the secretary of state, is conclusive testimony of the verity of the signature, and of the completion of the appointment; and that the appointment conferred on him a legal right to the office for the space of five years.
 

 2dly. That, having this legal title to the office, he has a consequent right to the commission; a refusal to deliver which, is a plain violation of that right, for which the laws of his country afford him a remedy.
 

 It remains to be enquired whether,
 

 3dly. He is entitled to the remedy for which he applies. This depends on,
 

 1st. The nature of the writ applied for, and,
 

 2dly. The power of this court.
 

 1st. The nature of the writ.
 

 Blackstone, in the 3d volume of his commentaries, page 110, defines a mandamus to be, “a command is-“suing in the king’s name from the court of king’s bench, "and directed to any person, corporation, or inferior "court of judicature within the king’s dominions, re-"quiring them to do some particular thing therein speci-"fied, which appertains to their office and duty, and “which the court of king’s bench has previously deter-“mined, or at least supposes, to be consonant to right “and justice.”
 

 Lord Mansfield, in 3d Burrows 1266, in the case of the
 
 King v.
 
 Baker,
 
 et al.
 
 states with much precision and explicitness the cases in which this writ may be used.
 

 “ Whenever,” says that very able judge, “there is a “right to execute an office, perform a service, or exercise “ a franchise (more especially if it be in a matter of pub-“lic concern, or attended with profit) and a person is “kept out of possession, or dispossessed of such right, and
 
 *169
 
 "has no other specific legal remedy, this court ought "to assist by mandamus, upon reasons of justice, as the “writ expresses, and upon reasons of public policy, to "preserve peace, order and good government.” In the same case he says, “this writ ought to be used upon all “occasions where the law has established no specific “remedy, and where in justice and good government “there ought to be one.”
 

 In addition to the authorities now particularly cited, many others were relied on at the bar, which show how far the practice has conformed to the general doctrines that have been just quoted.
 

 This writ, if awarded, would be directed to an officer of government, and its mandate to him would be, to use the words of Blackstone, “to do a particular thing “therein specified, which appertains to his office and “duty and which the court has previously determined, “or at least supposes, to be consonant to right and jus-“tice.” Or, in the words of Lord Mansfield, the applicant, in this case, has a right to execute an office of public concern, and is kept out of possession of that right.
 

 These circumstances certainly concur in this case.
 

 Still, to render the mandamus a proper remedy, the officer to whom it is to be directed, must be one to whom, on legal principles, such writ may be directed; and the person applying for it must be without any other specific and legal remedy.
 

 1st. With respect to the officer to whom it would be directed. The intimate political relation, subsisting between the president of the United States and the heads of departments, necessarily renders any legal investigation of the acts of one of those high officers peculiarly irksome, as well as delicate; and excites some hesitation with respect to the propriety of entering into such investigation. Impressions are often received without much reflection or examination, and it is not wonderful that in such a case, as this, the assertion, by an individual, of his legal claims, in a court of justice; to which claims it is the duty of that court to attend; should at first view be considered
 
 *170
 
 by some, as an attempt to intrude into the cabinet, and to intermeddle with the prerogatives of the executive.
 

 It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.
 

 But, if this be not such a question; if so far from being an intrusion into the secrets of the cabinet, it respects a paper, which, according to law, is upon record, and to a copy of which the law gives a right, on the payment of ten cents; if it be no intermeddling with a subject, over which the executive can be considered as having exercised any control; what is there in the exalted station of the officer, which shall bar a citizen from asserting, in a court of justice, his legal rights, or shall forbid a court to listen to the claim
 
 ;
 
 or to issue a mandamus, directing the performance of a duty, not depending on executive discretion, but on particular acts of congress and the general principles of law?
 

 If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How then can his office exempt him from this particular mode of deciding on the legality of his conduct, if the case be such a case as would, were any other individual the party complained of, authorize the process?
 

 It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined. Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is
 
 *171
 
 again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation.
 

 But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which, the President cannot lawfully forbid, and therefore is never presumed to have forbidden; as for example, to record a commission, or a patent for land, which has received all the legal solemnities; or to give a copy of such record; in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department.
 

 This opinion seems not now, for the first time, to be taken up in this country.
 

 It must be well recollected that in 1792, an act passed, directing the secretary at war to place on the pension list such disabled officers and soldiers as should be reported to him, by the circuit courts, which act, so far as the duty was imposed on the courts, was deemed unconstitutional; but some of the judges, thinking that the law might be executed by them in the character of commissioners, proceeded to act and to report in that character.
 

 This law being deemed unconstitutional at the circuits, was repealed, and a different system was established; but the question whether those persons, who had been reported by the judges, as commissioners, were entitled, in consequence of that report, to be placed on the pension list, was a legal question, properly determinable in the courts, although the act of placing such persons on the list was to be performed by the head of a department.
 

 That this question might be properly settled, congress passed an act in February, 1793, making it the duty of the secretary of war, in conjunction with the attorney general, to take such measures, as might be necessary to obtain an adjudication of the supreme court of the United
 
 *172
 
 States on the validity of any such rights, claimed under the act aforesaid.
 

 After the passage of this act, a mandamus was moved for, to be directed to the secretary at war, commanding him to place on the pension list, a person stating himself to be on the report of the judges.
 

 There is, therefore, much reason to believe, that this mode of trying the legal right of the complainant, was deemed by the head of a department, and by the highest law officer of the United States, the most proper which could be selected for the purpose.
 

 When the subject was brought before the court the decision was, not that a mandamus would not lie to the head of a department, directing him to perform an act, enjoined by law, in the performance of which an individual had a vested interest; but that a mandamus ought not to issue in that case—the decision necessarily to be made if the report of the commissioners did not confer on the applicant a legal right.
 

 The judgment in that case, is understood to have decided the merits of all claims of that description; and the persons on the report of the commissioners found it necessary to pursue the mode prescribed by the law subsequent to that which had been deemed unconditional, in order to place themselves on the pension list.
 

 The doctrine, therefore, now advanced, is by no means a novel one.
 

 It is true that the mandamus, now moved for, is not for the performance of an act expressly enjoined by statute.
 

 It is to deliver a commission; on which subject the acts of Congress are silent. This difference is not considered as affecting the case. It has already been stated that the applicant has, to that commission, a vested legal right, of which the executive cannot deprive him. He has been appointed to an office, from which he is not removable at the will of the executive; and being so
 
 *173
 
 appointed, he has a right to the commission which the secretary has received from the president for his use. The act of congress does not indeed order the secretary of state to send it to him, but it is placed in his hands for the person entitled to it; and cannot be more lawfully withheld by him, than by any other person.
 

 It was at first doubted whether the action of
 
 detinue
 
 was not a specific legal remedy for the commission which has been withheld from Mr. Marbury; in which case a mandamus would be improper. But this doubt has yielded to the consideration that the judgment in
 
 detinue
 
 is for the thing itself,
 
 or
 
 its value. The value of a public office not to be sold, is incapable of being ascertained; and the applicant has a right to the office itself, or to nothing. He will obtain the office by obtaining the commission, or a copy of it from the record.
 

 This, then, is a plain case for a mandamus, either to deliver the commission, or a copy of it from the record ; and it only remains to be enquired,
 

 Whether it can issue from this court.
 

 The act to establish the judicial courts of the United States authorizes the supreme court “to issue writs of “mandamus, in cases warranted by the principles and “usages of law, to any courts appointed, or persons hold-"ing office, under the authority of the United States.”
 

 The secretary of state, being a person holding an office under the authority of the United States, is precisely within the letter of the description; and if this court is not authorized to issue a writ of mandamus to such an officer, it must be because the law is unconstitutional, and therefore absolutely incapable of conferring the authority, and assigning the duties which its words purport to confer and assign.
 

 The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish. This power is expressly extended to all cases arising under the laws of the United States; and consequently, in some form, may be exercised over the present
 
 *174
 
 case; because the right claimed is given by a law of the United States.
 

 In the distribution of this power it is declared that “the “supreme court shall have original jurisdiction in all “cases affecting ambassadors, other public ministers and “consuls, and those in which a state shall be a party. “In all other cases, the supreme court shall have appellate “jurisdiction.”
 

 It has been insisted, at the bar, that as the original grant of jurisdiction, to the supreme and inferior courts, is general, and the clause, assigning original jurisdiction, to the supreme court, contains no negative or restrictive words; the power remains to the legislature, to assign original jurisdiction to that court in other cases than those specified in the article which has been recited; provided those cases belong to the judicial power of the United States.
 

 If it had been intended to leave it in the discretion of the legislature to apportion the judicial power between the supreme and inferior courts according to the will of that body, it would certainly have been useless to have proceeded further than to have defined the judicial power, and the tribunals in which it should be vested. The subsequent part of the section is mere surplussage, is entirely without meaning, if such is to be the construction. If congress remains at liberty to give this court appellate jurisdiction, where the constitution has declared their jurisdiction shall be original; and original jurisdiction where the constitution has declared it shall be appellate; the distribution of jurisdiction, made in the constitution, is form without substance.
 

 Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them or they have no operation at all.
 

 It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it.
 

 
 *175
 
 If the solicitude of the convention, respecting our peace with foreign powers, induced a provision that the supreme court should take original jurisdiction in cases which might be supposed to affect them; yet the clause would have proceeded no further than to provide for such cases, if no further restriction on the powers of congress had been intended. That they should have appellate jurisdiction in all other cases, with such exceptions as congress might make, is no restriction; unless the words be deemed exclusive of original jurisdiction.
 

 When an instrument organizing fundamentally a judicial system, divides it into one supreme, and so many inferior courts as the legislature may ordain and establish; then enumerates its powers, and proceeds so far to distribute them, as to define the jurisdiction of the supreme court by declaring the cases in which it shall take original jurisdiction, and that in others it shall take appellate jurisdiction; the plain import of the words seems to be, that in one class of cases its jurisdiction is original, and not appellate; in the other it is appellate, and not original. If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction, and for adhering to their obvious meaning.
 

 To enable this court then to issue a mandamus, it must be shewn to be an exercise of appellate jurisdiction, or to be necessary to enable them to exercise appellate jurisdiction.
 

 It has been stated at the bar that the appellate jurisdiction may be exercised in a variety of forms, and that if it be the will of the legislature that a mandamus should be used for that purpose, that will must be obeyed. This is true, yet the jurisdiction must be appellate, not original.
 

 It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. Although, therefore, a mandamus may be directed to courts, yet to issue such a writ to an officer for the delivery of a paper, is in effect the same as to sustain an original action
 
 for
 
 that paper, and therefore seems not
 
 to
 
 belong to
 
 *176
 
 appellate, but to original jurisdiction. Neither is it necessary in such a case as this, to enable the court to exercise its appellate jurisdiction.
 

 The authority, therefore, given to the supreme court, by the act establishing the judicial courts of the United States, to issue writs of mandamus to public officers, appears not to be warranted by the constitution; and it becomes necessary to enquire whether a jurisdiction, so conferred, can be exercised.
 

 The question, whether an act, repugnant to the constitution, can become the law of the land, is a question deeply interesting to the United States; but, happily, not of an intricacy proportioned to its interest. It seems only necessary to recognise certain principles, supposed to have been long and well established, to decide it.
 

 That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected. The exercise of this original right is a very great exertion; nor can it, nor ought it to be, frequently repeated. The principles, therefore, so established, are deemed fundamental. And as the authority, from which they proceed, is supreme, and can seldom act, they are designed to be permanent.
 

 This original and supreme will organizes the government, and assigns,to different departments, their respective powers. It may either stop here; or establish certain limits not to be transcended by those departments.
 

 The government of the United States is of the latter description. The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction, between a government with limited and unlimited powers, is abolished, if those limits do not confine the persons on whom they are imposed, and if acts pro
 
 *177
 
 hibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.
 

 Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it.
 

 If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable.
 

 Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void.
 

 This theory is essentially attached to a written constitution, and is consequently to be considered, by this court, as one of the fundamental principles of our society. It is not therefore to be lost fight of in the further consideration of this subject.
 

 If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law ? This would be to overthrow in fact what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration.
 

 It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the use to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.
 

 
 *178
 
 So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determime which of these conflicting rules governs the case. This is of the very essence of judicial duty.
 

 If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.
 

 Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.
 

 This doctrine would subvert the very foundation of all written constitutions. It would declare that an act, which, according to the principles and theory of our government, is entirely void; is yet, in practice, completely obligatory, It would declare, that if the legislature shall do what is expressly forbiden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.
 

 That it thus reduces to nothing what we have deemed the greatest improvement on political institutions—a written constitution—would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction. But the peculiar expressions of the constitution of the United States furnish additional arguments in favour of its rejection.
 

 The judicial power of the United States is extended to all cases arising under the constitution.
 

 
 *179
 
 Could it be the intention of those who gave this power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?
 

 This is too extravagant to be maintained.
 

 In some cases then, the constitution must be looked into by the judges. And if they can open it at all, what part of it are they forbidden to read, or to obey?
 

 There are many other parts of the constitution which serve to illustrate this subject.
 

 It is declared that “ no tax or duty shall be laid on arti-“cles exported from any state.” Suppose a duty on the export of cotton, of tobacco, or of flour; and a suit instituted to recover it. Ought judgment to be rendered in such a case? ought the judges to close their eyes on the constitution, and only see the law.
 

 The constitution declares that “no bill of attainder or "ex
 
 post facto
 
 law shall be passed.”
 

 If, however, such a bill should be passed and a person should be prosecuted under it; must the court condemn to death those victims whom the constitution endeavours to preserve?
 

 “No person,” says the constitution, “shall be convicted “of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court.”
 

 Here the language of the constitution is addressed especially to the courts. It prescribes, directly for them, a rule of evidence not to be departed from. If the legislature should change that rule, and declare
 
 one
 
 witness, or a confession
 
 out
 
 of court, sufficient for conviction, must the constitutional principles yield to the legislative act?
 

 From these, and many other selections which might be made, it is apparent, that the framers of the consti
 
 *180
 
 tution contemplated that instrument, as a rule for the government of courts, as well as of the legislature.
 

 Why otherwise does it direct the judges to take an oath to support it ? This oath certainly applies, in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support!
 

 The oath of office, too, imposed by the legislature, is completely demonstrative of the legislative opinion on this subject. It is in these words, “I do solemnly “swear that I will administer justice without respect “to persons, and do equal right to the poor and to the “rich; and that I will faithfully and impartially discharge “all the duties incumbent on me as accord-“ing to the best of my abilities and understanding, agree-“ably to
 
 the constitution,
 
 and laws of the United States.”
 

 Why does a judge swear to discharge his duties agreably to the constitution of the United States, if that constitution forms no rule for his government? if it is closed upon him, and cannot be inspected by him?
 

 If such be the real state of things, this is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime.
 

 It is also not entirely unworthy of observation, that in declaring what shall be the
 
 supreme
 
 law of the land, the
 
 constitution
 
 itself is first mentioned; and not the laws of the United States generally, but those only which shall be made in
 
 pursuance
 
 of the constitution, have that rank.
 

 Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that
 
 courts,
 
 as well as other departments, are bound by that instrument.
 

 The rule must be discharged.