# Presidential Authority to Direct the Chairman of the Council of Economic Advisers Not to Comply With a Congressional Subpoena Seeking Testimony About Private Activities

Although there has been a practical construction, extending back to the earliest days of this Republic, of the respective powers of the Congress and the Executive, under which the President may order his subordinates in the Executive Branch to withhold information from the Congress when he deems such action to be in the public interest, it is difficult to justify application of this principle with respect to a congressional subpoena seeking an official's testimony regarding his private activities prior to the time of his close official connection with the President.

February 19, 1952

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

The question has been raised as to whether Mr. Leon R. Keyserling, Chairman of the Council of Economic Advisers, could be directed by the President not to appear and testify, in response to a subpoena issued by a subcommittee of a committee of the Senate, with respect to his political views and his expressions of these views, through a period of time beginning several years before he was made a member of the President's immediate official family after the enactment of the Employment Act of 1946, Pub. L. No. 79-304, § 4, 60 Stat. 23, 24, *codified at* 15 U.S.C. § 1023, which established the Council in the Executive Office of the President.

There are in general two theories on which such a refusal might be justified. Most frequently, support is found in the power of the President to hold information confidential in the public interest. Another theory that has been suggested is that the official subpoenaed cannot be spared from his conduct of the public business.

The latter ground would seem to be the most difficult to justify in the present case. The only cited instance of its recognition that has been found occurred in 1806, in a case where the Secretary of State, the Secretary of War, and the Secretary of the Navy had been summoned to appear in the United States Circuit Court in New York. Declining to honor the subpoena, they wrote to the judges presiding at the trial that, in view of the state of public affairs, the President was unable to dispense with their services at that moment, and that it was uncertain whether they would at any subsequent time be able to absent themselves from their official duties. In order not to prejudice the court in the exercise of its functions, however, they signified their willingness to give testimony by deposition. *United States v. Smith*, 27 F. Cas. 1192, 1194 (C.C.D.N.Y. 1806) (No. 16,342). Conceivably, the assertion could be made that the President is unable to spare Mr. Keyserling at any time, now or in the indefinite future, to appear before a congressional subcommittee, but it is questionable whether such a statement

would be accepted without serious reservations, either by the public or by a court sitting in judgment on a possible prosecution for contempt of Congress.

A more frequently used basis for the refusal of an official close to the President to obey a congressional subpoena exists in the well-established practice of the Presidents in their discretion to hold information of various types to be confidential in the public interest, and to decline to permit its divulgence outside of the Executive Branch of the government.

Instances of the practice may be adduced as far back as the administration of George Washington. In 1796, for example, President Washington declined to comply with a request of the House of Representatives to furnish it with a copy of the instructions to ministers of the United States who had initiated a treaty with Great Britain.

In 1803, in his famous opinion in *Marbury v. Madison*, Chief Justice Marshall recognized the right of Attorney General Levi Lincoln, who had been Secretary of State as of the time of the transactions in question, to refrain from disclosing to the court information which had been communicated to him in confidence. 5 U.S. (1 Cranch) 137, 143–44 (1803). In so doing, the Chief Justice recognized that "[t]he intimate political relation, subsisting between the president of the United States and the heads of departments, necessarily renders any legal investigation of the acts of one of those high officers peculiarly irksome, as well as delicate; and excites some hesitation with respect to the propriety of entering into such investigation." *Id.* at 169; *see also Appeal of Hartranft*, 85 Pa. 433, 443–50 (1877).

There are more recent instances as well of the refusal of an official of the Executive Branch to appear and testify before courts or congressional committees in response to direction or subpoena.

In 1905, Attorney General Moody advised the Secretary of Commerce and Labor, who had been subpoenaed by a state court to appear and testify before it, that he was not legally bound to obey the subpoena. *Executive Departments—Official Records—Testimony*, 25 Op. Att'y Gen. 326 (1905).

In 1909, President Theodore Roosevelt instructed his Attorney General not to respond to that portion of a Senate resolution which directed the latter to inform the Senate as to why legal proceedings had not been instituted against the United States Steel Corporation. In a strongly worded message to the Senate, the President declared that "I have instructed the Attorney-General not to respond to that portion of the resolution which calls for a statement of his reasons for nonaction. I have done so because I do not conceive it to be within the authority of the Senate to give directions of this character to the head of an executive department, or to demand from him reasons for his action. Heads of the executive departments are subject to the Constitution, and to the laws passed by the Congress in pursuance of the Constitution, and to the directions of the President of the United States, but to no other direction whatever." 43 Cong. Rec. 528 (1909).

In 1944, the Director of the Federal Bureau of Investigation refused to answer certain questions put to him by a congressional committee, and further declined to show the committee a copy of the President's directive to him on which his refusal was based. *Study and Investigation of the Federal Communications Commission: Hearings Before the Select Committee to Investigate the Federal Communications Commission*, 70th Cong. pt. 2, at 2334, 2337 (1944). In the same investigation, a congressional request for the appearance of several Army and Navy officers was refused. *Id.* pt. 1, at 14, 21, 67–68 (1943).

In 1948, the Secretary of Commerce refused to obey a House Resolution directing him to supply certain information relating to the loyalty of the head of a Bureau in that Department. H.R. Doc. No. 80-625 (1948).

These instances, and many others, are evidence of a practical construction, extending back to the earliest days of this Republic, of the respective powers in this field of the Congress and the Executive, under which the President may order his subordinates in the Executive Branch to withhold information from the Congress when he deems such action to be in the public interest.

It is difficult, however, to justify the application of the principle with respect to information relating, as I understand it, mainly to Mr. Keyserling's *private* activities *prior to* the time of his close official connection with the President.

In order to support application of the principle in this instance, it might be asserted that, because of Mr. Keyserling's current close official association with the President, the risk of his disclosing confidential official information would be present even though the questions themselves were directed to Mr. Keyserling's activities before the time of his intimate association with the President. Alternatively, it might be urged that if the President feels, on whatever grounds seem to him to be persuasive, that revelation of the information sought by the committee would be prejudicial to the public interest even though the information itself is not in the category of public documents or "official" information, he would be justified in directing Mr. Keyserling not to appear before a congressional subcommittee for the purpose of supplying such information while Mr. Keyserling is in his immediate official service. Such a position would represent an extension of the presidential prerogative beyond any precedent with which I am acquainted, and I am unable to predict whether or not it would command sufficient support to be sustained if the question were forced to litigation in a contempt prosecution.

It should be pointed out that, if the President should decide to direct Mr. Keyserling not to obey the subpoena, the refusal itself need not necessarily state the theory of justification on which the President is relying. In 1948, for example, in reply to subpoenas served personally upon John R. Steelman, one of the assistants to the President, directing him on two separate occasions to appear before a House subcommittee, Mr. Steelman did not appear but returned the subpoenas to the chairman of the subcommittee with a letter stating, among other things, that "in each instance the President directed me, in view of my duties as his assistant, not

to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948). The theory underlying a refusal, however, would seem to be largely determinative of the degree to which public opinion receives the refusal with favor, and must of course be depended upon for a successful defense against a prosecution for contempt of Congress.

Even if the course of refusal to appear is decided upon, it is suggested that it might be wise for the President to demonstrate his desire to cooperate with the subcommittee in any appropriate inquiry which it might make, by authorizing Mr. Keyserling to submit to the subcommittee for its use a statement of affirmance or denial of specific allegations that have been made, together with such additional remarks as might be considered appropriate. It would appear that such a statement should meet the needs of the subcommittee. Nevertheless, the President might also make it known that he has further authorized Mr. Keyserling to transmit to the subcommittee, if that body after receiving and considering his statement should wish to ask him additional specific questions, such additional relevant information in his possession as may properly be disclosed. Such a course should succeed in preserving the confidential nature of information that ought not to be disclosed in the public interest, while at the same time lending every assistance to the committee in its work. For use in drafting such a letter to the subcommittee, if it is the decision of the President to follow that course, a suggested form which such a letter might take is attached.

In addition to the question of Mr. Keyserling's position in this matter, there has also been raised the question of the status of his wife, as to her obligation to obey a similar senatorial subpoena to appear and testify on the same alleged activities of Mr. Keyserling, and possibly of herself. I understand that Mrs. Keyserling is employed as an economist at the Department of Commerce.

As an employee of the federal government, it would appear that in general Mrs. Keyserling is equally subject with any other federal employee to a congressional subpoena. To justify her refusal to appear, it would seem necessary flatly to assert that her husband's position is such that the President cannot permit any federal employee to disclose the information requested. I know of no precedent for such action. On the other hand, there has been no previous instance, as far as I am aware, where the question has been raised.

JOSEPH C. DUGGAN
*Assistant Attorney General*
*Executive Adjudicative Division*

ATTACHMENT

My dear Mr. Chairman:

I am returning herewith the subpoena issued under date of _____, 1952, by the Subcommittee on Internal Security of the Senate Committee on the Judiciary, and signed by you as Chairman of that Subcommittee, directing me to appear before it on _____, 1952, to testify concerning certain alleged associations or conversations attributed to me. The President has directed me, in view of my duties as Chairman of the Council of Economic Advisers, not to appear before the Subcommittee for that purpose.

However, in view of the President's desire not to interfere with or impede appropriate inquiries of the Subcommittee, he has permitted me to transmit for the use of the Subcommittee the accompanying statement relating to certain specific allegations which have been reported in the newspapers. In my opinion, the statement speaks for itself and is complete. Should the Subcommittee, however, after receiving and considering this statement, desire any further specific information from me, I shall be glad to transmit to it in response to specific questions such additional relevant information as I may have which may appropriately be disclosed.

Sincerely,

_____