# Appointment of Member of Holocaust Memorial Council

The process of appointing an individual as a member of the United States Holocaust Memorial Council was not completed.

Even if the process of appointing a member of the Council had been completed, the President's appointment of another individual to that same position effected a removal of that appointee.

February 6, 2003

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked for our opinion whether an individual who claims to occupy a position as a member of the United States Holocaust Memorial Council ("Council") was actually appointed to that position. On the facts presented to us, which we set forth below, this question is indistinguishable from a question we previously answered regarding persons claiming to occupy positions as trustees of the John F. Kennedy Center for the Performing Arts. *See* Memorandum for Timothy E. Flanigan, Deputy Counsel to the President, from Daniel L. Koffsky, Acting Assistant Attorney General, *Re: Kennedy Center Board of Trustees* (Oct. 10, 2001) ("Kennedy Center Memorandum"). Consistent with the Kennedy Center Memorandum, we conclude that the process of appointing the putative appointee was never completed.

You have further informed us that on May 29, 2002, President Bush appointed another individual to serve as a Council member in the very position to which the putative appointee claims to have been previously appointed. We conclude below that if *arguendo* (and contrary to our conclusion on your first question) the putative appointee was in fact actually appointed to that position, President Bush's subsequent appointment of another individual to that same position effected a removal of the putative appointee.[*]

## I.

The Council operates as the board of trustees of the United States Holocaust Memorial Museum ("Museum"): it has "overall governance responsibility for the Museum, including policy guidance and strategic direction, general oversight of Museum operations, and fiduciary responsibility." 36 U.S.C. § 2302(a) (2000). The Council consists of 65 voting members. Of these voting members, 55 are appointed by the President; five are appointed by the Speaker of the House of Representatives from among members of the House; and five are appointed by the President pro tempore of the Senate from among members of the Senate. *Id.*

---

[*] Editor's Note: We are not identifying in the published version of this opinion the names of the putative appointee to the Council or the other individual appointed to the Council.

§ 2302(b). In addition, the Council has three "ex officio nonvoting members"—one appointed by the Secretary of the Interior, one by the Secretary of State, and one by the Secretary of Education. *Id.*[1]

Our opinion rests on the following understanding of the facts:

In a memorandum dated May 18, 2000, Bob Nash, who was Assistant to the President and Director of Presidential Personnel, recommended that President Clinton "approve" the putative appointee for the vacant position on the Council "vice: Beth Dozoretz." The memorandum provided lines labeled "Approve" and "Disapprove" immediately after the recommendation. President Clinton checked the "Approve" line.

On May 25, 2000, the Office of Presidential Personnel sent the White House Counsel's Office ("Counsel's Office") a memorandum stating that "President Clinton has approved" the putative appointee and asking that the Counsel's Office "initiate a preliminary background investigation on" the putative appointee. Letter for Alberto R. Gonzales, Counsel to the President, from Lanny A. Breuer, Covington & Burling, Tab C (Aug. 9, 2002) ("Covington Memorandum"). On May 31, 2000, the putative appointee submitted information requested of him for the background investigation. *See id.*, Tabs G–H. By letter dated June 21, 2000, Mr. Nash congratulated the putative appointee "on your selection by the President to be a member" of the Council; in that same letter, he advised the putative appointee of forms that needed to be completed "in order for the appointment process to proceed." *Id.*, Tab I. On June 26, 2000, the Counsel's Office sent a memorandum back to Mr. Nash reporting that it had "completed its clearance review of the nomination" of the putative appointee and advising that "such nomination may proceed." *Id.*, Tab J. On June 29, 2000, the Office of the Press Secretary released a statement that the President had "today announced his intent to appoint" the putative appointee and three other individuals to the Council. *Id.*, Tab K.

According to White House appointments practice, the following steps remained to be taken after the Counsel's Office memorandum reporting on the background investigation. The Director of Presidential Personnel would then draft a memorandum to the President, stating that the appointment could proceed. This memorandum would go first to the Executive Clerk's Office, so that the Executive Clerk could prepare either a commission, if time permitted, or an order of appointment, with a commission to follow. The Executive Clerk would then forward the memorandum and the appointment papers to the President, through the Staff Secretary. The President's signature would typically be affixed by autopen. The package would then return to the Executive Clerk, who would record the appointment and transmit the appointment papers to the Department of State.

---

[1] The statutory designation of appointing authorities for certain Council members and the inclusion of members of Congress on the Council raise serious constitutional questions that are beyond the scope of the issue that you have asked us to address.

In the case of the putative appointee, a search of documents has not uncovered any memorandum from the Director of Personnel, nor has it uncovered a commission or order of appointment signed by President Clinton. We assume, for purposes of this analysis, that no commission or order of appointment exists. Each of the three other individuals whom the June 29 press release stated that President Clinton intended to appoint to the Council was thereafter appointed by commission. One commission was signed on July 28, 2000, and two other commissions were signed on September 5, 2000.

On May 29, 2002, President Bush appointed another individual to serve as a Council member. President Bush appointed that individual to the same seat—"for a term expiring January 15, 2005 (vice Beth E. Dozoretz)"—to which the putative appointee had sought appointment.

On January 9, 2003, counsel for the putative appointee provided your Office an affidavit that former President Clinton had signed on November 25, 2002, setting forth his understanding of the facts and law relating to the appointment process for the putative appointee. *See* Affidavit of William Jefferson Clinton ("Clinton Affidavit"), *attached to* Letter for David G. Leitch, Deputy Counsel to the President, from Robert A. Long, Jr., Covington & Burling (Jan. 9, 2003). In that affidavit, Mr. Clinton states:

> While serving as President of the United States, I made a final decision to appoint [the putative appointee] to serve as a member of the Holocaust Memorial Council and exercised the authority conferred on me as President of the United States to appoint him to that position. As described in detail below, I made a record of my decision to appoint [the putative appointee] by placing a check mark next to his name on a Decision Memorandum prepared for me by the Director of Presidential Personnel. *My decision to appoint [the putative appointee] was final, subject only to the requirement that [the putative appointee] successfully complete a background check.* [The putative appointee] satisfied this requirement, his appointment was publicly announced and he entered into service as a member of the Holocaust Council, where I understand he has served with honor for two years.

Clinton Affidavit ¶ 4 (emphasis added). Mr. Clinton further states:

> As a matter of routine, members of the White House staff took the ministerial steps in connection with an appointment following completion of the background check, including issuing a press release, preparing and delivering a commission to the appointee, etc. These steps were not essential to the valid exercise of my Presidential power of appointment.

*Id*. ¶ 9.

## II.

We first address whether the putative appointee was actually appointed a member of the Council.

The definitive statement of many aspects of appointment law is Chief Justice Marshall's opinion for the Supreme Court in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).[2] There, President John Adams had signed a commission to appoint William Marbury as a justice of the peace, and the seal of the United States had been affixed to the commission, but the commission had never been delivered. Although the case had to do with an appointment by the President with the Senate's advice and consent, the Court's analysis of the acts constituting or evidencing an appointment appears equally applicable to appointments by the President alone. According to *Marbury*, "[t]he appointment being the sole act of the president, must be completely evidenced, when it is shown that he has done everything to be performed by him." *Id.* at 157. Typically, that last act is the President's signing a commission for the appointee. However, because the Constitution treats as separate the making of an appointment and the issuing of a commission, the appointment might "be evidenced by any public act other than the commission." *Id.* at 156. In either case—the signature on a commission or the other public act – the "appointment is evidenced by an open, unequivocal act; and being the last act required from the person making it, necessarily excludes the idea of its being, so far as respects the appointment, an inchoate and incomplete transaction." *Id.* at 157.

We believe that under the White House's regular appointments practice the signing of a commission or an appointment order would be the "open, *unequivocal* act," *id.* (emphasis added), showing the appointment to be complete; and on the facts as we understand them, no such document was signed. Nor was there any other "open, unequivocal act" of appointment. Therefore, the appointment of the putative appointee was never made.

The documents made available to us, which were prepared in or issued by officials at the White House, indicate that until the signing of a commission or appointment order, an appointment was still "inchoate and incomplete." *Id.* After the President checked "Approve" on the memorandum conveying the recommen-

---

[2] Whether or not members of the Council appointed by the President are "Officers of the United States" in the constitutional sense, *see* U.S. Const. art. II, § 2, cl. 2, the statute providing for their appointment calls for applying the principles applicable to appointment of such officers. Under the statute, these members are "appointed . . . by the President," 36 U.S.C. § 2302(a), and "[i]n our view, the statute uses the term 'appointment' in the same sense as does the Constitution." *Federal Election Commission—Appointment of Members (2 U.S.C. § 437)*, 2 Op. O.L.C. 359, 359–60 (1977). Furthermore, the practice has been to treat appointment of members in the same way as appointment of officers, both in the signing of commissions or appointment orders and in the affixing of the seal to the commissions. *See* 5 U.S.C. § 2902(a) (2000) (seal to be affixed to "the commission of an officer appointed by the President").

dations of the Office of Presidential Personnel, a memorandum from the Office of Presidential Personnel to the White House Counsel's Office requested a "preliminary background investigation" on the candidate approved by the President. *See* Covington Memorandum, Tab C. When the background investigation was finished, the Counsel's Office notified the Office of Presidential Personnel that the "nomination may proceed." *See id.*, Tab J. The press release then issued about the putative appointee and the three other persons selected announced the President's "intent to appoint" those persons. *See id.*, Tab K. These documents are inconsistent with the view that an appointment had already been made when the President checked the "Approve" line on the May 18 memorandum or when the press release was issued.

Indeed, if a commission had been issued at the end of this process, it would have begun with these words: "Know ye, that reposing special trust and confidence in the Integrity and Ability of [name of appointee], I *do appoint* him [name of office], and do authorize and empower him to execute and fulfil the duties of that Office according to law." *See* E-mail for Daniel L. Koffsky, Office of Legal Counsel, from G. Timothy Saunders, Executive Office of President, *Re: Standard Straight Appointment Commission Language* (Oct. 1, 2001). If an appointment order had been used, it also would have stated on its face that the President was then making the appointment: "I *hereby* appoint [name of appointee] to be a Member of the United States Holocaust Memorial Council for a term expiring [date]."

The practice of the Executive Clerk, as explained to us, conforms to the conclusion that it is the commission or, when an appointment order is used, the appointment order that signifies the appointment: the Executive Clerk records the date of the appointment as the date of the commission or, in cases when an appointment order has first been issued, the date of the appointment order. The issuance of a commission or order of appointment, as well as the Executive Clerk's recording of the date of appointment, makes up the "practice of the Executive" and provides the framework in which the events surrounding appointments are to be understood. *See Bennett v. United States*, 19 Ct. Cl. 379, 383 (1884).[3]

To be sure, the signature on the commission or appointment order might typically, although apparently not invariably, be inscribed by autopen rather than the President's own hand. But "the executive practice which existed at that time in such cases . . . must be taken to have been done with the knowledge and consent of the President, if not by his express direction." *Id.* at 385. The autopen, like the President's own hand, could give effect to an instrument signifying that a person had been appointed. "Where the President's signature is to appear on a document, the signature generally may be affixed by any means, such as . . . by the use of a

---

[3] Within the framework of the White House's appointments practice, we therefore do not agree with former President Clinton's legal assertion that the execution of a commission or appointment order was "not essential" to his exercise of his appointment power. Clinton Affidavit ¶ 9.

mechanical signature device." Letter for John D. Ehrlichman, Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Att. at 7 (Mar. 20, 1969). The signing of the commission or appointment order, therefore, was the "last act required from the person making [the appointment]," *Marbury*, 5 U.S. at 157, and until that act, the appointment was "inchoate and incomplete," *id.*

The putative appointee nonetheless contends that he was actually appointed. He appears to rely either on the President's checking the "Approve" line on the May 18 memorandum or on the June 29 White House press release stating the President's "intent to appoint" the putative appointee. This argument, we believe, cannot overcome what the documents say.

Reliance on the President's checking the "Approve" line mistakes the character of the "open, unequivocal act" that shows an appointment to have been made. *Marbury*, 5 U.S. at 157. After such an unequivocal act, there can be no discretion as to the appointment, because the appointment is complete. The Court in *Marbury*, addressing an office with protected tenure, explained:

> The discretion of the executive is to be exercised until the appointment has been made. But having once made the appointment, his power over the office is terminated in all cases, where by law the officer is not removable by him. The right to the office is *then* in the person appointed, and he has the absolute, unconditional power of accepting or rejecting it.

*Id.* at 162. Even if the tenure of the office is not protected, the President is still without discretion as to the appointment. Although he may arrest the commission before delivery, he is then removing the officer, not declining to appoint him. *Id.* And it is, of course, not just the President who has no further discretion over the appointment. To his subordinates, too, are left only ministerial acts, such as putting the seal on the commission. *Id.* at 158.

Here, when the President checked the "Approve" line on the May 18 memorandum, the "preliminary background investigation" of the putative appointee had not been completed. Former President Clinton's own affidavit confirms this point: "My decision to appoint [the putative appointee] was final, *subject only to the requirement that [the putative appointee] successfully complete a background check*." Clinton Affidavit ¶ 4 (emphasis added). The judgment whether, in light of the background investigations, the putative appointee was fit for office had not yet been made. Such judgment can be exceedingly delicate and, in any event, calls for the exercise of discretion. The act of checking the "Approve" line on the May 18 memorandum, therefore, cannot be the "unequivocal act" signifying an end to discretion about making an appointment.

Nor does the June 29 press release show that the appointment had been completed. The press release announced only the President's "intent to appoint" the

putative appointee and three other persons. The reference is clearly to a future act, not to one that already had taken place on, or as of, a specified date. Indeed, each of the three other persons was later appointed by commission.

For the putative appointee, "the last act required from the person making [the appointment]" was never performed. *Marbury*, 5 U.S. at 157. The appointment remained an "inchoate and incomplete transaction." *Id.*

## III.

On the assumption *arguendo* that the putative appointee was properly appointed a member of the Council, we next turn to the question whether he would remain a member. This question is easily answered. It has long been established that appointment of a successor to a removable officer has the effect of displacing the incumbent. *See, e.g.*, *Wallace v. United States*, 257 U.S. 541, 545 (1922); *Mullan v. United States*, 140 U.S. 240, 246–47 (1891); *Nominations for Prospective Vacancies on the Supreme Court*, 10 Op. O.L.C. 108, 109 (1986). By subsequently appointing another individual to the same position[4] that the putative appointee would have occupied, President Bush would have effected the putative appointee's removal from that position. Therefore, even if (contrary to our conclusion) he had been properly appointed in the first instance, the putative appointee would no longer be a member of the Council.

## IV.

Applying the same analysis as in the Kennedy Center Memorandum, we conclude that the putative appointee was never actually appointed to a position as a member of the Council. If he had been, President Bush's appointment of another individual would have effected the putative appointee's removal from that position.

M. EDWARD WHELAN III
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[4] The other individual's commission states that he was appointed "vice Beth E. Dozoretz." If, contrary to fact, the putative appointee had previously been appointed to the seat previously occupied by Ms. Dozoretz, it would have been better form for his commission to state that he was appointed "vice [the putative appointee]." But any imperfection in form would not have affected the validity of the other individual's appointment, so long as it would have been clear (as it would have) to which office he was being appointed. *See Marbury*, 5 U.S. at 157 ("appointment is evidenced by an open, unequivocal act").