Catron, Ch. J.
delivered the opinion of the court.'
Peter Fisher made his will in 1827. He had several slaves who he devised should be free; that they should have a right to reside upon his plantation for fifteen years; have laid off to them horses, cattle and farming utensils to make a support with, and a year’s support from the then crop, and ten dollars in money. The balance of his property was devised to his brother’s and sister’s children as residuary legatees.
The testator died, and the will was duly proved and recorded. The executors therein named did not qualify, and James Dabbs’ was appointed administrator with the will annexed. He refused to petition the county court to have the slaves emancipated pursuant to the will, because he would not involve himself by giving bond and security that they would not be a county charge. Thus the matter stood until the act of 1829, ch. 29, was passed, authorizing the slaves to apply to the chancery court by their next friend by bill, and giving that court jurisdiction to decree emancipation. The bill was filed and proceeded in to a decree and an appeal.
It is insisted the act of 1829 is retrospective and void as against the distributees and residuary legatees of Peter *126 Fisher. That they by his death took a vested right in the slaves, and to the property devised to them after their emancipation, which vested right the act of 1829 gives the Chancellor no power to divest; and that the Legislature having no such power, could of course confer none on the Chancellor. If the premises be true, the conclusion is. Had the legislature the power in 1829 to declare these slaves free persons by act of Assembly? As between Peter Fisher and his slaves, his will, on his death, was a deed of emancipation. Legislation in restraint of manumission aside, and they owed no personal services to the representatives of Peter Fisher, were as free agents as themselves, and as capable of enjoying every natural right. Being in the enjoyment of natural liberty, of course they had a right to the enjoyment of the property devised to them by their late master. The idea that a will emancipating slavés, or deed of manumission, is void in this State, is ill founded. It is binding on the representatives of the devisor in the one case, and the grantor in the other, and communicates a right to the slave; but it is an imperfect right, until the State, the community of which such emancipated person is to become a member, assents to the contract between the master and the slave. It is adopting into the body politic a new member; a vastly important measure in every community, and especially in ours where the majority of free men over twenty one years of age, govern the balance of the people, together with themselves; where the free negro’s vote at the polls, is of as high value as that of any man. Degraded by their color and condition in life, the free negroes are a very dangerous and most objectionable population where slaves are numerous. Therefore no slave can be safely freed but with the assent of the government where the manumission takes place. But this is a mere matter of public policy, with which the master or the slave -cannot concern. It is an act of sovereignty, just as much as naturalizing the foreign subject. *127 The lushest act of sovereignty a government can perform, is to adopt a new member with ail the privileges and duties of citizenship. To permit an individual to do this at pleasure, would be wholly inadmissible. How or when the State assents to the contract of manumission, whether before or after its execution, is beside „the contract, has nothing to do with its obligation on the master or the slave, and is unrestricted by the constitution. Was there a general law authorizing all free persons to emancipate their slaves at pleasure, then the assent of the government would be given in advance of the act of the master. Such was the law in effect and practice before the passage of the act of 1777, ch. 6, to prevent domestic insurrections, and for other purposes. The act declared no slave should thereafter be set free, except for meritorious services, to be adjudged of and allowed by the county court, and license first had and obtained thereupon, &c.
The county court had conferred upon it the sovereign power to give the assent of the government to the manumission, but was restricted in giving assent to especial cases, where the slave had performed some extraordinary service. This of course extended to the great mass of slaves, and particularly to children who could not have performed any such service. To free the mother, and retain as slaves the children, often violáted humanity; as did the giving freedom to the husband or wife, and retaining the other in slavery. To obviate these and such like hardships, the act of 1801, ch. 27, was passed. By this act, the county court is given as plenary power as the Legislature itself possessed, to emancipate slaves on petition of the owner; nine or a majority of the justices being present, and two thirds concurring. The court is to examine the reasons set forth by the petition, and if it be of opinion, that acceding to the same would be consistent with the interest and policy of the State, the chairman shall report the petition as granted, and sign the same; *128 which shall be filed of record. The same power and discretion is by the act of 1829, ch. 29, conferred on the Chancellor. It is argued the Chancellor has ho discretion, by the act of 1829, in cases coming within its provisions. We think it did not intend that his powers and those of the county court should differ, as either might be applied to, to execute the law. The Chancellor was not on this branch of the proceeding before him, trying a cause between the slaves of the estate of Peter Fisher and his representatives, but he was acting as the authorized deputy of the State of Tennessee, and in this capacity it lay upon him to adjudge whether it was consistent with the interest and policy of the State, that the slaves who had devised to them their freedom by Peter Fisher, should be manumitted in confirmation of the will. He determined that Washington, one of the slaves, should be freed, and that the others should not be. This was a sentence from which an appeal lay to this court. The discretion to be exercised, was a legal discretion, requiring the Chancellor to adjudge. On the appeal, it is made our duty to give such judgment or sentence, as the court below ought to have given. It rests upon us to determine what is the policy most for the interest of the community generally, and of Sumner county in particular, in this matter. That policy can best foe ascertained from the act of 1831, ch. 52. The State has there spoken, and might,, by that act, have given her assent to the bequest in Peter Fisher’s will, as she has in other similar cases, had she seen fit; and she might in future give her assent in this case, were this court to refuse, as was in effect done in the instance of David Beatty’s slaves, as will be seen in the cause of Hope vs. Johnson, 2 Yerger’s Rep. 123. The policy of the act of 1831, is not to permit a free negro to come into the State from abroad; and secondly, not to permit a slave freed by our laws, to be manumitted upon any other condition than .that of being forthwith transported from the *129 State, to which, by the first section, he dare not return. We bold this law to have been every way binding on the Chancellor’s discretion, and that it is so on ours. We think it is .clearly inconsistent with the policy of the State, and the interest of its citizens, to give the assent of the government to the manumission of these slaves, upon any terms short of their immediate removal beyond, not only our jurisdiction, but beyond the limits of the United States of America.
The injustice of forcing our freed negroes on our sister States without their consent, when we are wholly unwilling to be afflicted with them ourselves, is so plain and direct a violation of moral duty, as to inhibit this court from taking such a step. To treat our neighbors unjustly and cruelly, and thereby make them our enemies, is bad policy and contrary to our interest. Would it not be treating the non-slaveholding States unjustly, to force our freed negroes upon them without their consent ? and would it not be treating the slaveholding States cruelly? We are ejecting this description of population, fearing it will excite rebellion among the slaves; or that the slaves will be rendered immoral to a degree of depravity inconsistent with the safety and interest of the white population. These are fearful evils. But are they not more threatening to Virginia, (just recovering from the fright of a negro rebellion,) to the Carolinas, to Georgia, Alabama, Mississippi and Louisiana, than to us? Compared with the whites, most of them have two slaves to our one; some of them almost ten to our one. Even Kentucky has a higher proportion than Tennessee. How can we then as honest men, thrust our freed negroes on our neighbors of the south?
Suppose the non-slaveholding states north-west of the Ohio, were willing to receive our freed negroes, (a supposition by the way wholly untrue,) would it be good policy in us to .locate;them on our .borders, beside our great rivers, forming wretched free negro colonies in con *130 stant intercourse with óur slaves? They must live in neighborhoods separated from the whites. Their condition has and will preclude intermarriages and close association. . That such a population inhabiting a country near us, would become a most dangerous receptacle to our runaway slaves, and a grievous affliction to the State where situated, as well as to ourselves, need only be stated to gain universal admission. The time would soon come when the attempt to seize on the harbored slaves would produce war with such a people, and serious collisions with the State within whose jurisdiction they resided. This it is our interest to avoid.
All the slaveholding states, it is believed, as well as many of the non-slaveholding, like ourselves, have adopted the policy of exclusion. The consequence is, the freed negro cannot find ahorne that promises, even safety, in the United States, and assuredly none that promises comfort. We order the present petitioners for freedom to be emancipated on the terms, that they be sent beyond the limits of the United States, for additional reasons. The act of 1833, ch. 64, to aid the colonization society, provides, that the treasurer of Middle Tennessee pay tó the treasurer of the society for its use, ten dollars for each free black person that the treasurer of the society shall certify has been removed from the State of Tennessee to the coast of Africa. The foregoing society has formed a colony of free blacks at Liberia, on the coast of Africa. The people residing there are all from the United States, speak our language, pursue our habits, profess the Christian religion, are sober, industrious, moral and contented, are enjoying a life of comfort and of equality, which it is impossible in this country to enjoy, where the black man is degraded by his color, and sinks into vice and worthlessness, from want of motive to virtuous and elevated conduct. The black man in these States may have the power of volition. He may go and come when it pleaseth him, without a domestic master to control the *131 actions of his person; but to be politically free, to be the peer and equal ol the white man, to enjoy the offices, trusts and privileges our institutions confer on the white man, is hopeless now and ever. The slave, who receives the protection and care of a tolerable master, holds a condition here, superior to the negro who is freed from domestic slavery. He is a reproach and a by-word with the slave himself, who taunts his fellow slave by telling him ‘he is as worthless as a free negro.’, The consequence is inevitable. The free black man lives amongst us without motive and without hope. He seeks no avocation, is surrounded with necessities, is sunk in degradation; crime can sink him no deeper, and he commits it of course. This is not only true of the free negro residing in the slaveholding States of this Union: in the non-slaveholding States the people are less accustomed to the squalid and disgusting wretchedness of the negro, have less sympathy for him, earn their means of subsistence with their own hands, and are more economical in parting with them, than him for whom the slave labors, of which he is entitled to share the proceeds, and of which the free negro is generally the participant, and but too often in the character of the receiver of stolen goods. Nothing can be more untrue than that the free negro is more respectable as a member of society in the non-slavehold-ing, than the slaveholding States. In each, Jie is a degraded outcast, and his fancied freedoms delusion. With us, the slave ranks him in character and comfort, nor is there a fair motive to absolve him from the duties incident to domestic slavery, if he is to continue amongst us. Generally, and almost universally, society suffers, and the negro suffers by manumission.
These are some of the reasons why we give the assent of the State to the emancipation of the^se slaves, in accordance to Peter Fisher’s will, upon the condition, and the condition only, that they be transported to the coast of Africa. To the course pursued in this instance, *132 there might be exceptions in other cases; but they should be most rare, and grounded on reasons the most prominent and conclusive. This application furnishes none such. Bond and security will be given, partly in accordance with the second section of the act of 1831, ch. 102, conditioned, that these freed persons shall be transported to the colony of Liberia, on the coast of Africa, and which shall form part of the judgment of this court.
The act of 1831, ch. 101, in effect directed the chancery court to dismiss this cause. Chancellor Reese, in a very lucid opinion, treated the act, and justly, as an unauthorized mandate, unconstitutional and void. This court adopts that opinion, which is herewith filed.

Decree affirmed.

The following is the opinion of Chancellor Reese, referred to and adopted in the foregoing opinion.
The act of 1S29, ch. 29, contains two important features: first, it declares it to be the duty of the executor, when there is a bequest of liberty to a slave, to endeavor to procure his emancipation. This had before that time been ruled to be his duty, by the supreme court of the State, in the cases of M’Cutchen vs. Price and wife, 3 Haywood’s Rep. 211, and Ann Hope vs. Johnson, 2 Yerger’s Rep. 123. And in the second place, that if the executor fail to perform this duty, the slave by his next friend may file his bill, and have his rights or claim to liberty under the will, enquired into and determined. These decisions, and this act of assembly prove, that the rigor of former opinions, on the subject of slavery had, whether properly or otherwise, not a little relented. The act recognizes the bequest of freedom as a valuable right to the slave himself, to be prosecuted by him under some circumstances, in the courts of the country. After the passage of this act of assembly, the slaves in question, by Andrew Hays, Esq. of Davidson, filed their bill in this court, the administrator with the will annexed, con *133 tinuing to refuse any application on his part, in their half, to the county court of Sumner, and in their bill they make James Dabbs, the said administrator, a party defendant, and allege the material facts herein before stated; pray that they maybe emancipated; and also pray that an account may be taken of the personal property bequeathed to them by the will, and of their hire since the death of the testator. Dabbs filed his answer; admits his refusal to petition the county court of Sumner, on behalf of complainants; expresses his willingness, and even anxiety, that the will of the testator on the matter should be carried into effect, and exhibits an account of the hire of the negroes. Jeremiah Fisher, who claims to have purchased the interest of the other devisees of Peter Fisher, thereupon filed his cross bill, making Hays and Dabbs party defendants, and alledging collusion between them; and charging that the refusal of Dabbs to apply to the county court of Sumner, on behalf of the complainants, was with a view to give this court jurisdiction; and also praying an account against Dabbs as administrator. Hays and Dabbs severally answer, and deny the above allegations. On the application of Fisher at the July term of this court, this crossbill was consolidated with the other case. By a previous order of this court, pursuant to the provisions of the act of 1829, ch. 29, the complainants were put into the custody of the clerk and master of this court, an account was ordered between the parties, and a report made which has been confirmed. Replications were filed, and the cause in a state for hearing at the present term of this court. Under these circumstances, the following act of assembly, passed November 28tb, 1831, is produced to the court, entitled, “An act to explain and amend an act passed December 7th, 1829, ch. 29, more effectually to provide for the emancipation of slaves.” This act provides that “the above recited act shall in no wise be so construed as to extend' to any case where any person may, by their last will and_ testament, *134 have directed any slave or slaves to be set free, before the passage of the before recited act, which this is intended to amend; but in all such cases where any suit shall have been instituted in the district chancery court under the provisions of the act which this is intended to amend, it shall be the duty of the Chancellor, at the first term of the court after the passage of this act, to have the same stricken from the docket; and it is hereby made the duty of the clerk of said court, to transmit to the clerk of the county court where the parties reside, the whole of the record and proceedings in said cause, which shall stand for trial at the first term of the county court thereafter, under the same rules, regulations and restrictions, as if the said suit had been originally instituted in said county court; provided, however, that the costs which shall or may have accrued, shall abide the final issue of the suit.”
Upon this act of assembly, the court has been moved by the solicitor of Fisher, that this cause, pursuant to its mandates, be stricken from the docket. And the question is, shall this be done? Is the respect and deference for the legislative will, when distinctly expressed, which is justly due from this court, and fully acknowledged by it, to be countervailed, in the present instance, by that paramount obligation, which is exacted by the fundamental law? It is a proposition not tobe controverted, that not courtesy only, but duty requires of courts of justice, in expounding legislative enactments, with reference to their conformity to the constitution, to give them such examination as will reconcile them together, and not bring them into conflict, and to be clearly satisfied that a law is unconstitutional, before they so pronounce it.
There is this difference, it occurs to me, between the situation of a legislator and a judge; the former should yield his support to no measure unless fully convinced of its conformity to the constitution; the latter should give effect to all the statute laws of the State, when he no more than doubts the legislative competency to have passed them. *135 But the duty of a judge is obvious and acknowledged, to pronounce an act of the legislature unconstitutional when he believes it to be so; and it is the peculiar province of the judicial department to expound laws and pronounce upon their conformity with the constitutional will of the people. The question recurs, shall the court strike the cause in question from the docket? The legislature has said it shall, and at the present term. I entertain no doubt that the act in question was passed with the purest motives, and upon the fullest conviction, perhaps, of its propriety and justice.
It is pretty evident, however, that the legislature was not only uninformed, but probably misinformed of the situation and matter of this case; of this bill and cross-bill, and of the relation in which the parties stand to each other, and the previously existing laws; for the clerk of this court is ordered to transmit the whole record and proceedings in the cause to the county court, and the county court are ordered to try the cause so transmitted, under the same rules, regulations and restrictions which would have governed them if the cause had been instituted there. The only cause which could have been instituted there by law, would have been a petition by Dabbs, administrator, as plaintiff, in behalf of complainant’s freedom. But this petition Dabbs has not filed, and would not file; and because of his refusal, he is a defendant to this bill; but I waive this consideration, as also, the further consideration, that in striking this cause from the docket, I should strike off matter properly cognizable in this court, without reference to the act of 1829, and meet the question fairly upon the main point.
The act of 1831 contains three propositions worthy of consideration: that the act of 1829, ch. 29, ought in no wise to be so construed as to extend to cases where a will directed slaves to be set free before the passage of the act; that, therefore, the court should strike such causes from the docket, and that the clerk transmit the record *136 to the county court. If the first proposition were correct, that is, that the proper construction ot the act of 1829, does not confer upon this court jurisdiction over a cause circumstanced like the present, the substance of the legislative mandate would follow, and the cause would, if not literally stricken from the docket, be dismissed; indeed, if such had been the opinion of my predecessor and the other Chancellor, the orders which have been made in the cause would not have existed.
It is for the legislature to pass the law, and for the court to expound it. They did pass the law of 1829, and the court here present is of opinion, that a proper construction of that act, as applied to the facts of this case, gives to the court cognizance of the cause. They took cognizance accordingly, and now we are informed by the act of 1831, that the former act ought to be so construed, and should be construed as in no wise to apply to a case like this. I need not argue to show how little authoritative a conclusion, a legislative exposition of a former act should be considered. The counsel for the motion are understood to concede that legislative expositions are not to be relied on, and that the exposition in question is not well founded. Here, then, is a case where a right deemed valuable, and a proper subject for litigation, the right to freedom under a will, is brought into this court in pursuance of the law, and the matter proper for the investigation of this court is pending; the facts and circumstances which fix the rights of the parties and give the jurisdiction of the court, are past, or already exist, when a simple legislative mandate comes to us and says, such a cause shall not be tried, shall be stricken from the docket. This is the whole of the matter; for if the legislative exposition of the act of 1829 goes for nothing, there is nothing left but the simple, naked, direct mandate of the legislature to strike the cause from the docket; for the balance of the law is a mere direction to the clerk. Shall this court, can this court obey the *137 mandate? If it may in this cause, it may in any; it may in all. Shall the rights of all the parties in this cause to that relief and to that remedy, by due course of law, which their case calls for, be disregarded and this court be closed against them? For the - efficacy- of the act of 1831, and the duty of this court with regard to it, cannot depend upon the fact that a motion has been made to give it effect. If that motion could succeed, the duty of the court would have been the same if all the parties had been not only willing but anxious to proceed in this court.
The Declaration of Nights, sec. 17, provides, that all courts shall be open, and “every man, for an injury done him in his lands, goods, fame or reputation, shall have remedy by due course oflawandright and justice administered without sale, denial or delay.” This declaration, copied from the great charter, is not a collection of unmeaning epithets. In England, the reason of riveting this barrier around the rights of the subject, was well understood. Their sovereign was wont to interfere in the' administration of justice; “a remedy by due course of law” was often refused under the mandate of men in power, and the injured man denied justice; they were ordered sometimes not to proceed with particular causes, and justice was delayed; and the obtainment of their rights was often burdened with improper conditions and sacrifices, and justice was sold. So anxious were they to stop this enormous evil, that a part of the official oath of a judge was, that he would proceed to do right and justice, notwithstanding any letter or order to him to the contrary. This clause of Magna Charta — why is it inserted in our bill of rights? Was it from apprehensions of our executive? We had left him no power. Whatever power is considered as properly belonging to the executive department elsewhere, is, by our institutions, conferred upon the legislature. It is the more important therefore, and so the framers of our constitution decreed, that the judicial department should be independent and co-ordin *138 ate and that the legislature should have no judicial now-er. Danger might justly be apprehended from this quarter. ‘‘The judicial power (the whole of it) shall be vested in such superior and inferior courts of law and equity,” &c. If the legislature, possessing a large share of executive power, be permitted to exercise judicial power also, or control the action of the judges within their peculiar sphere, the liberty of the citizens, under the government of good legislators, would be in imminent peril, and under bad ones would be entirely destroyed.
The duties and powers growing out of the relation between the legislature and the judicial department, and the lines of demarkation between them, have been the subject of earnest and elaborate discussion in the courts of the several States, and particularly those of the United States; and in the cases of Dartmouth College, of Fletcher and Peck, and of Green and Biddle, and of many others which need not be referred to, the principles applicable to questions of this sort are well settled, and the only difficulty is to apply them to the facts of particular cases. A distinction between the right and the remedy, is made and exists. But where the remedy has attached itself to the right, and is being prosecuted by “due course of law,” to separate between them, and take away the remedy is to do violence to the right, and comes within the reason of that provision of our constitution which prohibits retrospective, or in other words retroactive laws from being passed, or laws impairing the obligation of contracts.
By the act of 1829, all slaves in whose favor there is a devise of liberty, and where the representative of the testator, refuses to apply to the county court, they may file a bill by their next friend in this court; the act of 1831 attempts to take away this right from a portion of them, and from that portion of them where the right and remedy had attached by the actual pendency of a suit, in a “due course of law.” Is not this partial and *139 unequal legislation? It is believed it is. It would give me much more pleasure, if duty would permit, to conform to the will of the legislature. This feeling is inspired not only by respect and courtesy, but perhaps also by a lively sense of the feeble and unsustained character of judicial power, which rests only upon the moral feelings, upon the reason of the community. An improper yielding to legislative enactments is a danger more to be apprehended from the judicial department, than rash or uncalled for opposition. The history of every age and of every country has, in every page of it, shown this tobe the case.
The independence of the judiciary ought to be anxiously preserved unimpaired; not on account of the individuals who may happen to be judges, they are nothing, but on account of the security of life, liberty and property to the citizen.
I feel satisfied that I have no sympathies which would have misled me in this matter; for when permitted to indulge my feelings and opinions as an individual, I find them in strong and direct hostility to all schemes for emancipating slaves under existing circumstances, in the bosom of our community.
Let the complainants, in the cross-bill take nothing by his motion.
After the opinion in the above cause was pronounced, G. S. Yerger, the counsel of Fisher, moved the court to’ set aside the decree, and to rehear the cause, for the reasons set forth in the following petition to rehear:
The opinion of the court in this case, as delivered by the Chief Justice, assumes the following positions as the foundation upon which the decree is based: 1. That the act of 1829, ch. 29, is constitutional, because the will of Peter Fisher vested a right to freedom (though an imperfect one) in his slaves; that as between the devisees of Peter Fisher and his slaves, the latter were free; but that *140 the gift of freedom was inoperative as vesting an immedíate and absolute right to freedom until the assent ol the State was obtained.
2. That “how or when this assent to the contract of manumission is given, is beside the contract, has nothing to do with its obligation on the master or slave, and is unrestricted by the constitution.”
3. That “the county court by the act of 1777, had conferred upon it the sovereign power to give the assent of the government to the manumission, but was restricted in giving assent to especial cases, where the slave has performed some extraordinary service.”
4. That the act of 1777 is repealed by the act of 1801, and that the latter act gives to the county court the right of assenting in all cases, when nine, or a majority, believe it would not be inconsistent with the interest and policy of the State.
5. That the same power and discretion given to the court by the act of 1801, is conferred upon the Chancellors by the act of 1829, ch. 29; thát the power of the county court and the Chancellor was the same; that the Chancellor was not, on this branch of the proceeding before him, trying a cause between the slaves of Peter Fisher and his representatives, but that he was acting as the authorized deputy of the State of Tennessee, and in this, capacity was to judge, whether it was consistent with the interest and policy of the State that the slaves should be free.
6. That the State may assent, either directly' as by legislative act, or by the appointment of agents or deputies to examine the matter, and assent for her.
7. That the State may, if she choose, change her agent or deputy, or take from the county court the power given by the act of 1801, and vest it either concurrently or exclusively in the Chancellor or any other agent: and
8. That the act of 1831, ch. 101, is unconstitutional and void.
*141 The above positions, it is believed, are without doubt established by the principles assumed in the opinion of the court. It is not my intention, at this time, to controvert any of them except the last, and, it seems to me, assuming that the court are correct in the first seven, they are wholly in conflict with the decree upon the last; or in other words, although the court decides that the act of 1831, ch. 101, is unconstitutional, in conformity with the Chancellor’s opinion, yet the principles they were forced to assume to support the constitutionality of the act of 1829, ch. 29, most incontrovertibly prove that the act of 1831 is also constitutional.
It cannot be denied that the constitutionality of the act of 1829, is wholly supported by the court, upon the ground that the devisees of Peter Fisher had no rights, absolute or conditional; and that it was not retrospective in its operation upon past cases, within the meaning of the 20th section of the bill of rights, because it merely changed the agent who is to assent or dissent on the part of the State. If the above principles and reasoning be correct, do they not inevitably establish the conclusion that the same sovereign power, which gave to the Chancellor the right or authority to assent for her, can, by the same exercise of its authority, revoke, or take it from him before he has executed it, and revest it in the county court.
If the legislature had the power (which the court admit they had) of abrogating the authority of the county court, or vesting it concurrently in the Chancellor, by what process of reasoning will this court convince the State that she has not the same right to take it away from the Chancellor? If the principle is correct in the one case, it is beyond question, indubitably right in the other; and motives of humanity or supposed abstract principles of justice, which sound much better in theory than beneficial to communities in practice, ought not to induce this court or the chancery court, to assume a power and au *142 thority, the exercise of which is expressly and emphatically prohibited to them by the legislature.
That it is the duty of this court to denounce as unconstitutional, all laws which come directly and obviously in conflict with the constitution, is a position which no enlightened jurist or sound expositor of constitutional law will deny; but, that the courts are bound by every act or statute within the scope of legitimate legislation, is a position so intimately blended with the first principles of our government, that even its mistaken violation in any case, cannot but be felt as a public injury: and with due deference it is submitted, that when this court decides that an act of the legislature, changing the agent appointed to give her assent in a given case, is an act of power inherent in every government, and unrestricted by the constitution, by what consistency of reasoning or argument, can the same court in the same opinion, say, that the government has not (before the power is executed) the right of revesting her original agent with the same authority, and denying it to the substitute or second agent.
If the assent of the State is only wanting, it is admitted in the opinion, that she may either give or withhold it. If she may withhold it, at what point or period of time must her act of withholding it be exercised? Will not the answer be, at any period before her agent has assented for her, or before her election to assent or dissent is determined? Does not reason, independent of law, tell us, that in this and every case where the mere assent of the government is wanting to perfect an act, which assent she is not compelled by contract to give, that she has the power at any period of time, although proceedings have been instituted to ascertain whether it would be proper for her to assent or not, to declare that she will in no case assent, and thereby stop the proceedings? Suppose that fifty wills had been made, ordering slaves to be emancipated, and petitions had been filed in the county court under the act of 1801, *143 could not the legislature repeal the act of 1801, and declare, that the county court should not have the power of assenting for her; that she had changed her policy; and that she had now determined that no slave should be set free? Will this court say this act would violate the constitution? Until the power is actually executed, has she not the right to revoke it? And if she has the power of giving or withholding her assent absolutely, has she not the same power to do it conditionally?
If her assent is merely wanting, (which the court in this case decide) no law, either general or special, delegating power to the county or chancery court, as her legally constituted organs, is beyond the power of a recall, before it is actually executed. She may declare that no slave shall be set free. She may say, no slave shall be emancipated by will. She may say that no chancellor or county court shall give her assent in any case, either in cases which arose before or which may arise after the passage of the law. What right has she conferred that she may not withhold? She orders, or rather authorizes an enquiry by bill before the chancellor, and by petition in the county court, to ascertain whether it is proper for her consent to be given. The very matter to be examined into, is the propriety of her agreeing to the devise of freedom or not, and before the chancellor assents for her she becomes satisfied it ought not to be given, and tells him to desist, that his authority is revoked, and that her consent cannot under the circumstance's be given; and although she has by this act determined the very matter for which the enquiry was set on foot, yet we are gravely told, that, because she authorized the enquiry, her act is unconstitutional. When it is conceded that she has the power to assent or not, is it not a legal farce to say she has not the control of the manner or way in which she chooses to give it? Does it not place the Chancellor in rather a strange attitude, when, as the constituted organ of the State, he says, I assent in her name to the eman *144 cipation of these slaves; and yet at the same time, the otate acting for herself, says, I reiuse my assent, and by the act of 1831* broadly declares that he has no such power; that it was once given to him, but before he executed it, it was revoked. But says the court, for this is the effect of the opinion in this case, you conferred the right upon these slaves to file a bill to get your assent; this right you cannot retract; you are now in my keeping; you shall not determine for yourself whether you choose to assent or not; you do not exactly understand what you are about; you do not know your own policy; you gave me a letter of attorney to act for you, and you have not the power to'revoke it.
It is demonstrable to my mind that the authority exercised by the chancery court, after the motion was made to send the cause to Sumner county, was wholly unauthorized by law. It was, by a mistaken application of the principles of the constitution, an encroachment upon the power and privileges of a co-ordinate' branch of the government; an encroachment, which if exercised to the extent contended for, will almost annihilate a sovereign right or prerogative belonging to all governments; the right of giving or withholding its assent to the admission of new members into the body politic.
It is in vain that we search the constitution for a prohibition to the exercise of the power claimed for the legislature in this case, unless it be found in that clause of the bill of rights which says, “that all courts shall be open, and every man .for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay.”
If this clause applied to slaves; if they had civil rights secured by the constitution, (which is denied, and for which see Jarman vs. Patterson, 7 Mon. Rep. 645;) *145 if this were one of several classes of causes depending in chancery between freemen; if it were in stricti juris a suit between parties, and not a mere proceeding to obtain the assent of the government to the emancipation of a slave, what is there in this clause, to prohibit the Legislature from passing such an act as that of 1831?' The Chancellor (in his opinion) says, “here is a case where a right deemed valuable, and the proper subject of litigation, &c. is brought into this court; the facts and circumstances which fix the rights of the parties, and give the jurisdiction of the court, are past, or already exist, when a simple legislative mandate comes to us and says, such a cause shall not be tried, shall be struck from the docket. ” Were this the act, or all of it, the Chancellor’s conclusion might probably be warranted. The Legislature under the 17th section of the bill of rights, would not have such power. To order a suit not to be tried, to be stricken from the docket, would perhaps be a direct violation of the constitutional right which every man has, by that section, to resort to the courts of justice to attain or establish his rights; it would in fact be a denial to him of “a remedy by due course of law.” But with due deference, is not the Chancellor mistaken in his facts ? Is the act of 1831 such as is stated by him? The act does not simply direct the cause of Fisher’s negroes to be dismissed; it directs all cases of a particular class, in all the chancery courts, to wit, those arising under wills previous to the passage of the act, not simply to be dismissed from the courts of justice, but to be dismissed from the chancery court and transmitted to the county, court to be there tried according to law. The latter part of the act must be taken in connection with the former; it is made the positive duty of the clerk to transmit and file the record in the county court. If he does not do his duty, he can be compelled to do so, as will be shown hereafter.
Suppose the legislature were to pass an act, that all *146 Pen<3ing in the circuit court for the specific perforni-anee of contracts, shall be dismissed from the docket, and that the clerk shall transmit the records to the chan-eery court, where the same shall be tried under the same rules, regulations and restrictions, as if they had been originally filed in the chancery court; what sound lawyer will aver that this act would be unconstitutional? What vested right of either party is violated? What denial or delay of justice takes place ? Are the courts shut against the party? One court, to be sure, is closed, because by the act its jurisdiction is taken away in the specified cases; but the court which has the jurisdiction, is open, and directed to be kept open, by the terms of the act, for it directs the causes to be there tried, and if tried, “justice will be administered according to law.” It is a mere change of jurisdiction, and instead of a denial of justice, the court is directed to administer justice and law to the parties. I ask what delay of justice is there? None; for it may or may not be tried in the chancery court sooner than in the circuit court; and the delay, if any, is merely incidental to the exercise of an undoubted legislative power. Where is the clause in the constitution to prohibit the passage of this law? I ask it to be shown, to be pointed out. The most zealous advocate for the rights of the slave cannot lay his finger upon it.
Has it ever been supposed that the act of 1827 was unconstitutional? That act authorizes the defendant in certain cases, where suit is brought against him in the county court, to move the court to transmit the cause to the circuit court for trial, and it is made the duty of the court to do so. This act has been practised under, and the county court of this county has, by mandamus, been compelled to transmit the cause to the circuit court. What is the difference between this act, or the act supposed in relation to the performance of contracts, and the act of 1831? Run the parallel and let us see.
*147 1. A law ordering bills for a specific performance to be dismissed and transmitted to the chancery court, is a law, not changing the rights of the parties, but merely the forum in which the rights are to be adjudged. So, a law ordering all cases where bills were filed to emancipate slaves, before the passage of the act of 1829, to be dismissed and sent to the county court for trial, is a law, not changing or altering any right of the parties, but merely changes the forum in which the rights are to be adjudged.
2. The former law denies to the circuit courts jurisdiction in a particular class of cases, and confers it upon the chancery court. The latter (1831) denies the chancery court jurisdiction in a certain class of cases, and confers it upon the county courts. Neither law takes or deprives either party of any right. In neither case are the courts closed; the appropriate court is directed to be open. In neither case is justice denied;but, on the contrary, is ordered to be administered by the court to which the cause is transferred. In neither case is justice delayed; because it is as likely to be tried in one court as soon as the other. In both cases, the parties “have remedy by due course of law;” because whatever may be their rights, the remedy for trying them is directed and given by the law.
But it is insisted by the Chancellor, that the county court had no authority to try the case if the record wére transmitted from the chancery court, because that part of the act of 1831 ordering the transmission of the suit, and directing it to be tried under “the same rules, regulations and restrictions” as if it had been originally instituted in that court, cannot have effect, inasmuch as the' county court cannot entertain jurisdiction of a proceeding by bill in the name of the negroes, &c. but only a petition in the name of the master, under the provisions of the act of 1801. This position, with due deference, is far-fetched, and wholly untenable.
*148 The power of the legislature to give the county court authority to assent or dissent lor the government, m all cases arising under wills previous to the act of 1829, whether the proceeding is by bill in the name of the negroes, or petition in the name of the master, is admitted. Then the only and simple question is, whether the right to determine the cases embraced by the act of 1831, is by that act given to the county court, when the proceeding is by bill in the name of the negroes? An examination of the words and spirit of the act will remove all doubt upon the subject. 1st. The suit instituted in the chancery court by bill, &c. is directed to be dismissed. 2d. It is made the duty of the clerk to transmit the record in said cause to the county court of the county where the testator died. What cause is here meant? The answer is, the cause previously mentioned, i. e. the proceeding by bill in the name of the slaves. Then the bill of the negroep, by direct and positive words, is ordered to be filed in the county court. Then comes these words: “which shall stand for trial at the first term of the county court thereafter.” The word “which,” in this sentence, refers to “cause” for its antecedent. The clause will then read thus: “which cause, (that is the bill, &c.) shall stand for trial,” &c. Here then we have a positive direction; first, to file the record of the cause, that is, the hill of the negroes; and secondly, a further direction for the county court to try it. The legislature could not have conferred jurisdiction by more plain or precise words; and if the act of 1831, does not give authority to the county court to hear and determine the rights of the slaves as presented by the bill, then there is no force or precision in the English language.
Suppose the circuit court had no original jurisdiction of actions of debt, or of attachments, and a law were to pass ordering all actions of debt or attachments pending in the county court, to be transferred to the circuit court, and there stand for trial at the first term, &c. Would *149 not this give lunsdiction to the circuit court to try the actions oi debt and attachments mentioned m the act? That it would, will hardly admit of an argument; and yet the act of 1831, which is precisely the same, is denounced as unconstitutional.
But it is said, the act of 1831 says the cause must be tried “under the same rules, regulations and restrictions,” as if it had been originally instituted in that court; and that, as the county court had only power to try the matter by petition, these words exclude the idea of trying it by bill. These words have nothing .to do with that part of the act conferring the power to try the bill, &c. The Legislature, after they have ordered the bill to be tried, says, “you (the county court) shall try it under the same rules, &c. as if it had been originally instituted in your court; that is, you shall try the rights of the negroes in the proceeding by'bill, in the same manner, and under the same rules as you would try it, were it by petition; the same rules of evidence and of practice shall govern you; you shall make the same orders, &c. during the proceeding, as you would do if the proceeding were by petition.” No sensible construction can be given to the act but this.
A statute ought to be so construed that no clause, sentence or word could be superfluous or void. Bacon’s Abrigment, 380.
Where words in a statute are express, plain and clear, the words ought to be understood according to their genuine and natural import. Ib.
Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have expressed. S. C. U. S. 2 Cranch, 386, 399.
Such construction ought to be put upon a statute as may best answer the intention which the maker had in view, (6 Bacon, 384,) and when the intention can be discovered, courts are bound to follow it.
It is dangerous for judges to launch out too far in con- *150 struma; a statute, when the legislature have expressed themselves in plain language. Willes Rep. 397: 4 Dallas’ Rep. 30, note.
A legislative act is to be interpreted according to the intention of the Legislature apparent on its face. Every technical rule as to the force or construction of particular terms, must yield to the expression of the paramount will of the legislature. S. C. U. S. 2 Peters’ Rep. 662.
Where a court has general jurisdiction, but its proceedings in relation to a particular subject are specially pointed out by a statute, the mode so prescribed must be substantially pursued. 5 Harr. and Johnson, 130: 5 Am. Digest, 163.
When the intention of the Legislature is clear, and plainly expressed, the rule of law is, that the intention of the legislature must be obeyed. Per Judge Whyte, delivering opinion of Court, Trott vs. M’Broom, 1 Yerger’s Rep. 479.
The repeal of a law which gave authority to a court of Common Pleas, upon the petition of an administrator to sell land, divests no estate, but is the exercise of a legislative power which every legislature possesses. S. C. U. S. 2 Peters’ Rep. 523.
A privilege granted by the legislature to individuals, may be revoked or taken away. 12 Mass. Rep. 445.
The question whether a law be void for repugnancy to the Constitution, ought seldom to be decided in the affirmative in a doubtful case. The opposition between the constitution and the law ought to be such that the judge feels a clear and strong conviction of their utter incompatibility with each other. Fletcher vs. Peck, 6 Cr. 128.
The Chancellor, it is conceived, would have determined the matter differently, had he not fallen into an obvious mistake. He supposed the latter part of the law, directing the clerk, &c. was inoperative, and that it was a mere simple mandate to strike the cause from the docket. *151 Thus, he says, “If the legislative exposition of the aet go for nothing, there is nothing left but the simple, naked, direct mandate of the legislature, to strike the cause from the docket, for the balance of the law is a mere direction to the clerk.” Yes, it is a mere direction; but it is one which he is compelled to obejr to the same extent, that the clerk of the county court would be compelled to obey, if the Legislature took away its jurisdiction, and merely directed him to transmit the records of his court to the circuit court for trial.
If he did not choose to obey, a mandamus would quicken his movements, and he would be compelled. It is idle to say, the legislature did not mean, (when they took the-jurisdiction from the chancery court,) to give it to the county court; the whole act shows, it was made merely to change the agent who was to act for the State.
It is made the duty of the clerk, by the act, to transmit the record; and that a mandamus will lie to compel him to transmit it, if he should violate his duty, and refuse to do so, is a proposition abundantly supported by the authorities.
A mandamus lies to an inferior jurisdiction, or to an officer to require that which by the duty of his office he ought to do. 5 Comyn’s Digest, 33. To a mayor or other officer of a corporation, to compel him to do his duty, as to affix the corporate seal to the certificate of an election. 4 T. Reports, 699: Cowper, 367. To an old officer, or clerk, to deliver records which concern justice, to the new one. 5 Comyn, 34: 1 Sid. 31. So it lies to oblige an officer to do his duty, though there is a penalty for his neglect. Ib. 34: Burr’s Rep. 261. It lies to a register, to compel him to register deeds. 14 John. Rep. 325: 2 Hen. and Mun. 132. It will lie against a ministerial officer to compel him to do an act required by law to be done, where there is no other specific remedy. 3 Binney, 273: 5 Binney, 87: 6 Binney, 456: 3 Dallas, 42. It will lie to compel the Secretary of State to do *152 big duty, by delivering a commission to which the party jg entitled. Marbury vs. Madison, 1 Cranch, 137.
These authorities show the “mere direction” to the clerk, forms an essential part of the act.
The Chancellor, in his opinion, blends all the causes and all the parties, and then asks “shall the right of all the parties in this cause to that relief and to that remedy by due course of law which their cause calls for, be disregarded, and this court be closed against them? Who asked the Chancellor to dismiss Dabbs’ bill against Fisher, or Fisher’s against Dabbs for a distribution? True, they were united together for the purpose of a more speedy trial of all; but I imagine that it cannot be sensibly contended, that they were united together by a Siamese ligament, incapable of being sundered. It was surely in the power of the Chancellor to dismiss, and send to the county court of Sumner, the bill which fell within the class of cases mentioned in the act of 1831, and retain the others. There is not such magnetic power in an order to try two causes together, that they cannot, if the purposes of justice or of law require it, be sundered. I forbear to say more on this part of the subject, as it would be casting imputations upon the good sense and legal discrimination of this court.
The court will remark, that throughout, the Chancellor has based his opinion upon the supposition that the act of 1831 was a mandate, directing him to dismiss the cause of Fisher’s negroes, and affording no remedy to them to assert their rights. I have shown he is mistaken; for a “remedy by due course of law” is afforded by the words and spirit of the act of 1831. The act is compulsory upon the clerk; he must and can be compelled to transmit the record.
If the case had been, as he supposes, a mere order to dismiss, a denial of all remedy, or an order not to pro.ceed and try the case, there would then be some plausibility in his argument on the 17th section of the Bill of *153 Rights. But when it is shown, that it is only taking from him the jurisdiction conferred by the act of 1829, and conferring it on the county court; when, instead of destroying a remedy, it actually affords one, and only denies the enforcement of the remedy in a particular forum, or before the Chancellor; and when it is shown, that although he is directed not to proceed in the cause, yet the court to whom the jurisdiction is given, is, by direct and positive enactment, all his reasons based upon a supposed state of facts, which do not exist, necessarily fall to the ground.
The Chancellor again says: “A distinction exists between the remedy and the right; but when the remedy has attached itself to the right, and is being prosecuted by due course of law, to separate them and take away the remedy, is to do violence to the right.” This conclusion is conceded him; therefore the legislature cannot by any law destroy or take away all remedies to enforce an existing right. And if the law of 1831 had done this, it is surely unconstitutional. But here the Chancellor’s error is again apparent. He first suppposes the slaves to have a right, (which for argument is here admitted,) and then he supposes the act of 1831, ordering the suit to be dismissed, destroys and takes away all remedy, because he thinks the direction to the clerk is inoperative. If. the remedy is not destroyed, but is left to the party to be pursued in another tribunal, his reasoning again must consequently fall. And as I have clearly shown that the order of transmission is not inoperative, but binding, and can be enforced, the consequence is, that the act of 1831, so far from destroying or taking away all remedy, leaves the remedy precisely as given by the act of 1829; but merely orders the enforcement of the right through the medium of the remedy, to be before another tribunal.
If the legislature were to say no action of any kind should be hereafter sustained upon any contract, the law would surely be unconstitutional. But if they were. *154 to say no action of debt should be sustained upon a particular species of contract, but that it should be covenant, it would not. So, if debt had been brought, and they had ordered the suit to be dismissed and covenant to be brought, it would be unconstitutional; because such law would not merely change the remedy, but would de-privetheparty ofarightto receive his costs, if he succeeded, &c. But if the legislature were to order all actions of debt to be dismissed from the county, and sent to the circuit court, and there be tried, such law would undoubtedly be constitutional, because no remedy is taken away, nor is the right of the party to enforce his contract denied. The fact is, neither right nor remedy is affected by the act of 1831; they are still left to the parties, but the jurisdiction is changed; the remedy by bill is still retained; the rights'of the parties are still the same, except they are to be enforced or tried by the county court instead of the Chancellor. If the right to file a bill or commence a suit in a particular court, be such a constitutional or vested right, which the legislature cannot take away, as -the Chancellor maintains, then all legislative power to abolish courts, or change their jurisdiction, is destroyed.
The Chancellor says, by the act of 1829, the negroes had a right to file their bill in the chancery court, and that the act of 1831 takes away this right; and such power he denies the legislature.
This argument, it is apprehended, proves too much. It is admitted a “vested right” cannot be divested. But what is meant by a vested right? It is the privilege to enjoy property legally vested; to enforce contracts, and enjoy the rights of property conferred by the existing law. To take property from A and give it to B; to deny validity to contracts, legal when made; to prevent their enforcement according to the terms and stipulations of the parties; to compel a party to perform in a different manner from his stipulation or his contract; to com *155 pel a parly to receive one thing, when the other party has contracted to pay another. In these and like cases, rights would be divested. But a privilege, or right, (if you so choose to call it,) to resort to this or that particular court, is not such a right as the legislature is prohibited from changing.
By the act of 1809, chapter 54, every man who makes a contract under one hundred dollars, by note or bill, has a right to sue before a justice. Suppose the legislature were to repeal that act, and say he should sue in the county court; was the right to sue before a justice at the time the contract was made, such a constitutional right as prohibited the legislature from taking away the magistrate’s jurisdiction? Surely not; and yet, if the Chancellor’s reason is correct, that conclusion would inevitably follow. He says, the legislature gave the right to file the bill before him, and that such right cannot be taken away by giving the same power to the county court. I deny this to be a correct exposition of the constitution. Suppose the right given to sue before a justice has, in the language of the Chancellor, attached by actually proceeding to enforce it, but before he had acted on it, the legislature took away his jurisdiction, and ordered the suits over fifty dollars to be transmitted for adjudication to the pounty court. Is this law unconstitutional? Surely not; and if not, I should like to see the mind astute enough to tell me the difference between the supposed law and the act of 1831.
The first part of the 17th section of the Bill of Rights, so much relied upon, says, “all courts shall be open.” What does this mean ? Simply that the court or courts created by the legislature shall not, by any order or mandate of the legislature, be shut or closed against such asare obliged to resort to them for the enforcement of their rights. Does taking away from a particular court a part of its jurisdiction, and giving it to another court, close the courts against the assertion of the right? The moment the legislature takes *156 from one court a part of its turisdiction, and gives it to , , , , . , , , another, and they do not close the latter against the assertion of the right, the courts, according to their respective jurisdictions, are open, according to the strict letter of the Constitution. The meaning of the clause is, that all courts shall be open in all cases where by law they can exercise jurisdiction in the matter. When the legislature takes from one court its jurisdiction in particular cases, and vests it in another, the former cannot exercise it, and the latter must be resorted to.
I have thus shown in a case between individuals, recognised as citizens, that this law would be constitutional. But when we reflect that this is wholly a different case, a proceeding authorized by the legislature, merely to ascertain whether it would, in the language of the Chief Justice, be proper to admit a new member into the community, a proceeding which is intended to ascertain whether the State will agree, that the party shall enjoy and enforce those rights, which are spoken of in the constitution; the argument in favor of the legislative power in this particular instance, is, as I think, unanswerable.
Suppose the state had power to naturalize foreigners and receive them into the community, and that a law had passed authorizing all foreigners to apply to the county court, and if that court were of opinion, that it would be policy to naturalize and admit them, to do so: Suppose a proceeding had been instituted by a foreigner, and a law were to pass taking this power from the county court and giving it to the circuit court, and ordering all cases then before the court to be transmitted to the latter court; is the latter unconstitutional? Surely it is not: and if it is not, in the name of law and justice, tell me the difference between this law and the act of 1831.
Again: the legislature by law appoint a board of commissioners to ascertain the validity of land warrants, consisting of A, B, C, D, and direct the warrants to bé filed, and that they hear evidence, &c.; warrants *157 are filed; but before they are adjudicated, the legislature take all power from the commissioners, and order them to be filed with and proceeded on before the Secretary of State. It will not be pretended that this is an unconstitutional law.
For these reasons, it seems to me that the Chancellor erred in refusing to dismiss the cause and order it to be sent to Sumner county; and this court being bound to do what he ought to have done, should set aside the decree entered, and send it to that court to be proceeded in.
Catron, Ch. J.
The motion to set aside the decree in the case of Fisher’s negroes, was brought before the court on yesterday, the last business day of the term. My mind was too depressed with recent over exertion, to take that strong view of the subject, its intricacy and importance demanded; and I now feel myself wanting in vigor. However, there is no time left. The acts oi 1829, ch. 29, and 1831, ch. 101, received little consideration by this court when the opinion on the merits of the cause was drawn up. The court was satisfied with, and adopted the opinion of the Chancellor. Upon the high intelligence and ability of that gentleman, we felt safe in resting. Our own opinion is however now anxiously desired, on the construction of the act of 1831, and the party dissatisfied is entitled to it.
By the common law, the owner of a slave might manumit him at pleasure. The acts of 1777 and 1801, prohibited this, unless the government assented to the contract.of manumission. To give this assent, the county courts were vested with authority. A deed or will of manumission is not void, but binds the owner or representative of the testator, as between him and the slave: it confers a moral right to freedom upon the slave. Before the act of 1829, the master or his representative, the executor, was to do the first act; petition the court for the government’s assent. The slave had no power to cause *158 his right to be enforced by the courts of íustice. He had to deal with sovereignty; he could not sue the otate, and compel her to execute the contract with his master. It lay with her to direct the manner in which the remedy should be enforced. Bill of Rights, sec. 17. This is a prerogative of sovereignty, and is independent of the constitution. Then came the act of 1829, for more effectually emancipating slaves. It provides that where any person shall, by his last will, have directed any slave to be set free, it shall be the duty of the executor to petition the county court, as by the previous laws prescribed : and if the executor shoúld fail or refuse, it should be lawful for such slave to file his bill in equity by his next friend, and upon its being made to appear to the court that said slave ought to be free, the Chancellor should so order: and he is given jurisdiction to make all necessary interlocutory orders to secure the rights of the respective parties.
Under this act, Fisher’s negroes filed their bill; brought before the court the proper parties; were placed in the hands of a receiver, and the cause ready for hearing. Then was passed the act of 1831, ch. 101, professing to explain the act of 1829. It declares the act shall in no wise be construed to extend to any case where the will was made before its passage. To all subsequent cases, the act of 1829 still applies, and is in full force. In other words, the act of 1831 attempts a repeal of the jurisdiction of the Chancellor in the case of Fisher’s ne-groes; and orders the Chancellor at the next term to dismiss the cause. It next directs the clerk of the chancery court, to transmit to the clerk of the county court, the whole of the records and proceedings in said cause, which shall 'stand for trial at the first term of the county court.
The act declares, that of 1829 did not embrace such a case as that of Fisher’s negroes; that the chancery court had no jurisdiction of it; and is in effect a positive man *159 date sent to the Chancellor, in the form of an act of Assembly, £to strike the cause from the docket of his court,’ because, by the act of 1829, he had no jurisdiction, and had misconstrued the law. The Ghancellor had made interlocutory orders in the cause; he consolidated it with two others, between the administrator with Peter Fisher’s will annexed, and the principal legatees of the estate. Nothing but a final decree was wanting to end the controversy and settle the accounts of the estate, so intimately blended with the emancipation of the slaves, who were also legatees, that it was impossible finally to decree, until this was done or refused. The previous orders made in the causes, the legislature, by the act of 1831, attempted to reverse, and ordered directly, the principal bill to be dismissed.
By the act of 1829, the chancery court had undoubted jurisdiction of the cause. By article fifth of the constitution,’ the judicial power is to be vested in such courts of law and equity as the legislature may establish. It is an independent power, and where it has jurisdiction, a sovereign power, just as much as the legislature itself. He, who has a lawful right, and a legal remedy to enforce that right, and the jurisdiction of a court has attached upon it, is entitled to judgment. The legislature has no power to close the courts. The courts shall be open, and every man shall have remedy by due course of law. That is, every man having a legal right, and an open remedy. Article 11, section 17. The legislature may confer a right, and give a remedy to a slave. Having opened the courts to him, he is entitled, independent of his color or his civil condition, to have justice administered in the due course of law, without denial or delay. Peter Fisher’s negroes, by his will, took a right, a common law right, one binding on the executor, as a trustee; but their remedy rested with him; he might petition the county court or not, at his pleasure. If he did, the distributees of Peter Fisher could not complain. The case of David’s *160 negroes, 2 Yerger, 563. The act of 1829 gave a remedy to the slaves; not as against Peter Fisher’s representative; against him as trustee the previous law would have offered a remedy in equity; but the State as a third party had to assent to the manumission. The State could not be sued until a remedy was provided. The act of 1829, provided that remedy, in pursuance of article 11, section 17, of our constitution. The imperfect right to emancipation conferred by Fisher’s will, wanted nothing but the assent of the State to perfect it; and jurisdiction was given to the Chancellor acting in his judicial capacity, according to judicial forms, at his discretion, to manumit the complainants if he thought it consistent with the policy of the State. Though one of the widest known discretions, yet it was a legal discretion, and one he dare not refuse to exercise, either for or against the complainants. On this ground we exercise jurisdiction on this branch of the cause on appeal. Had the discretion been unrestricted, no appeal would have lain. The legislature had no power to dismiss the bill and to close the chancery courts against the complainants. This is not denied by the argument of the opposite counsel: but it is urged that a change of jurisdiction, from the chancery court to the Sumner county court, was within the power of the legislature.
That the legislature had the power to withdraw the cause from the chancery court, and order that court to send it to the Sumner county court for hearing, I think is clearly true, if the county court either had theretofore jurisdiction to hear the cause, or if the legislature then conferred the jurisdiction. But the county court had no chancery jurisdiction, by any previous law to that of 1831, and no power to finally hear the cause, in the form it would have been presented. Having no cognizance of the subject matter, the act of 1831 was a naked mandate to the Chancellor to turn the complainants out of his court and there leave them, unless the act conferred ju *161 risdiction of the cause, as a chancery cause, on the county court. Did it do sor ihe act tells us the cause shall stand for hearing in the county court at the first term, under the same rules, regulations and restrictions, as if the said suit had been originally instituted in said county court.
The court was to try the cause, not according to the rules and restrictions of the chancery court, but according to its own rules, long in force by the acts of 1777 and 1801, for the emancipation of slaves. That is, by petition, not by the slave, he could not come into the county court, or sue there, but by the master or his executor, setting forth the motives for the manumission, which, if approved, the court shall grant the petition, and record the evidence of the emancipation. Had the cause gone to the county court, the complainants had no right to take a single step as actors. The court had no right to take a single deposition on their behalf, or make any order or decree against James Dabbs or J. Fisher, or even to compel Baker, the receiver of the court of chancery, who had the complainants in possession, to deliver them to a receiver of the county court. An attempt to decree the legacy left the negroes, or to order an account for their hire, amounting to eight hundred dollars, would have been wholly beyond any powers of that court. None such are claimed for it. I therefore think, as my three brother Judges have all along thought, that the act of 1831 was a naked mandate to the Chancellor to dismiss the bill; that the act was retrospective of the rights of the complainants, and is void; and that the Chancellor did not err in hearing the cause.
Peck, J.
The act of 1829, ch. 29, gives a general jurisdiction to the court of chancery to carry into effect bequests of freedom, in last wills and testaments. In this act the duty of the executor and administrator with the will annexed, is declared; and if the executor or administrator *162 decline to act in the premises, provision is made that a next friend may sue on behalf of the slave for his freedom. In exercising the jurisdiction, the act provides that if it he made satisfactorily to appear to the court that such slave ought of right to be set free, it shall be so ordered by the court; and all such interlocutory orders shall be made as may be deemed necessary to secure the rights of the respective parties.
The evils this act intended to remedy, were those defects in previous laws which left unprovided for, the claims to freedom where given by last wills and testaments. The act of 1829 is plain in its enactments; it needed no provision in a subsequent law to aid the construction of it. The proceedings commenced under it and were before the Chancellor; and Dabbs, the executor, having decline dto act, the jurisdiction arose for him to exercise.
The act of 1831, ch. 101, purports to be an act to explain and amend an act passed December 7, 1829, ch. 29, (the same act.)
It declares that the act of 1829 shall extend to no case where any person may, before the passage thereof, have directed any slave or slaves to be set free. But in all such cases where any such suit shall have been instituted in the district chancery court, under the provisions of the act of 1829, it shall be the duty of the Chancellor, at the first term after the passage of this act, to have the same stricken from the docket, and the clerk to transmit to the county court where the parties reside, the records and proceedings in said cause, “which shall stand for trial at the first term of the county court thereafter, under the same rules, regulations and restrictions as if the said suit had been originally instituted in the county court.” The costs to abide the final issue.
Here is an apparent power given to a court to proceed by bill in a cause, of which, prior to the act, that court had no jurisdiction in that form. There are no *163 words giving express jurisdiction. It has been held as a rule touching the giving jurisdiction, where the same jurisdiction was not before given, that express words were necessary to give the exercise; and the reason for observing this rule is strongest where a jurisdiction as to the subject matter, resides already in another court.
There should not he conflicting powers in different tribunals, which power might be wholly defeated in struggling which should have it. The way to justice should be even-handed and without ambiguity.
The county court had no jurisdiction in chancery by bill; it could not be taken and exercised by powers conferred by implication. So long as the chancery court could exercise the power by direct authority, conferred by legislative enactment, that court had a right to retain it to herself; nay, being bound by her obligation to see that right and justice should be administered, and the case being in proper form before her for reaching right and justice, nothing but a supervising court could control the exercise of authority. When the Chancellor had his attention directed to the act which took the cause away from him, it was natural to enquire what was to be done with it. If he saw by the act that the rights of parties were suspended, and that a judgment or decree could never follow, he would be led to infer that the court, as to that cause or class of cases, was in effect shut.
If we take the act as a mandate coming from a. power competent to give it, still, as a judge, the Chancellor was bound to look to the end (that was to follow) of the controversy commenced before him.
How was the cause situated? It was to stand for trial at the first term. Was it prepared for trial? Of this we are not informed; and if this particular cause was prepared for trial, other cases might not be which were nevertheless to be transmitted. But further, “it shall stand for trial at the first term, under the same rules, regulations and restrictions, as if the same suit had been originally *164 instituted in said county court.” No such suit as this could be instituted in the county court; the jurisdiction in this form never was given to her. If it could not be instituted, it could not proceed; no decree could pass in the case. But it is said it is to be tried. How? The act says, was if commenced there.” The very terms of the act make the power to try depend upon the power to commence or originate the suit. As this power is wanting, the rules, regulations and restrictions that would apply to it in that tribunal, “as if it had been commenced there,” would cause it to be dismissed for the want of jurisdiction.
Clearly, if this jurisdiction is given to the county court, it is given by implication, not by express terms. The Chancellor must have seen it in that light; and if he did, he at the same time saw that his jurisdiction was not taken away.
Under this act of assembly there was no process by which the county court could get possession of this cause. Courts to whom a jurisdiction is given by express terms, are always jealous of encroachment upon that jurisdiction, and this for an obvious reason. The care of certain rights is committed; the courts should see these rights are preserved; it belongs to them; and the mind of the judge, of necessity, must be directed to the objects of its care. Hence the writ of prohibition, which is used in those cases where a jurisdiction is assumed which cannot be rightfully exercised, as where a military tribunal was proceeding, having no jurisdiction of the person charged. So too in the cases in our own State, where military tribunals imposed fines not having jurisdiction of the person, (Durham’s case,) and in the still more noted case of the Indian Tassels, in Georgia. These all illustrate the necessity of the court having jurisdiction, taking care that no encroachment shall be made upon that jurisdiction, which is obviously clothed with the right; and *165 this jealousy is just as important in questions of property or freedom, as in the case affecting life.
In the act we are considering, of 1831, there was no intention to repeal any act giving the power to the Chancellor to proceed by bill upon a bequest of freedom. It is assumed in the act of 1831, that the legislature never intended to give the power in cases which existed when the act of 1829 passed; there is no repealing clause; no intention to take away from the Chancellor the right which he had to act in the case specially designated in the act, occurring after the passage of it. The general power being left to the Chancellor, it behoved him to be astute in seeing whether the special power in the cases designated were taken away; and it was not taken away unless the jurisdiction was repealed, or in direct terms given to another; an act of assembly, directing the Chancellor to dismiss a suit before him, while the same act left the jurisdiction touching it remaining, would not be such an act as he should obey; for there would be two acts, the one commanding him to proceed, the other directing that he should desist. But the , love of duty, especially where it had been begun, would be to proceed; that is this case if the county court could not proceed.
But it is assumed, that the intention of the act is to give the cause to the county court, as if on petition. That cannot be the meaning of the act. The bill in chancery is to stand for trial as if commenced in the county court. What is spoken of? Not a petition, nor a proceeding which could be the foundation of a petition; it was a proceeding which had grown out of an act but recently passed, and which presented a case where a petition could not reach the merits. Dabbs having refused, the Chancellor was bound to see that the act of 3 831, so far as the mode by petition is given, had failed, then the Chancellor could assume jurisdiction by bill; certainly when such a case was presented he had jurisdiction in the form the law gave it, in exclusion of all others. It is not the business of tho *166 legislature to keep the Chancellor within his jurisdiction; and the least meddling with it is an attempt to interfere with the administration of justice, as the same has been committed to him.
When one of the kings of England wished to confer with the judges touching a case to come before them, he was refused admittance; if in this country it be conceded that all power is inherent in the people, and their voice is heard through the legislature, their voice must be consistent with the constitution and that general law of the land which is made to reach all alike; and whenever judges in this country cannot stand up as firmly and independently before the people .as the judges of England did before their sovereign, then there is an end of the administration of law, and a reign of terror at hand.
We are referred to many cases to show what shall be the construction to be put upon statutes; but it all results in this, that the intention of the legislature, where clearly expressed, shall be carried into effect.
There is no necessity for denying the rule here; one of two intentions must be inferred. First, that the suit was to be got rid of by ' (in the language of the act) “striking the cause from the docket,” without more; or that the county court was to take it up without authority to proceed in such a form and such a case, and decree on implied authority, or dismiss because not expressly given.
In short, the ambiguity in the act was of itself sufficient to retain the cause before the Chancellor. The act of 1831 may have been well intended, but it certainly came before the Chancellor in a questionable shape.
Motion refused.

 See the act, ante. page.