UNITED STATES of America,
Plaintiff,

v.

George Lawrence ANDREWS,
Defendant.

No. CR.SA–02–CR–258(2)FB.

United States District Court,
W.D. Texas,
San Antonio Division.

Jan. 28, 2004.

Thomas Joseph McHugh, Assistant United States Attorney, Joseph H. Gay, Jr., Assistant U.S. Attorney, San Antonio, TX, for U.S. Attorneys.

Celeste Marie Ramirez, Celeste Ramirez, Attorney at Law, Jack Carter, Federal Public Defender, San Antonio, TX, for Defendant.

## OPINION SUPPORTING A DEPARTURE IN SENTENCING

BIERY, District Judge.

"If the law supposes that . . . the law is . . . a idiot. . . . and the worst I wish the law is, that his eye may be opened by experience—by experience."

Mr. Bumble CHARLES DICKENS, THE ADVENTURES OF OLIVER TWIST 327 (Country Life Press 1900) (1897).

Mr. Bumble might feel the same about the sentencing law in this case. *See* 18 U.S.C. §§ 3551–3673, 28 U.S.C. §§ 991–998.

\*　　\*　　\*　　\*　　\*　　\*

The sentencing guidelines for assessing punishments in the federal courts work reasonably well in the large percentage of cases before this Court. *See also* U.S. GEN. ACCOUNTING OFFICE REPORT, FEDERAL DRUG OFFENSES: DEPARTURES FROM SENTENCING GUIDELINES AND MANDATORY MINIMUM SENTENCES, FISCAL YEARS 1999–2001 (No. GAO–04–105) (Oct.2003); U.S. SENTENCING COMM'N, REP. TO CONGRESS: DOWNWARD DEPARTURES FROM THE FED. SENTENCING GUIDELINES (Oct.2003). Because of the egregious circumstances present here, twenty five years' experience on the bench in assessing and reviewing punishment teaches that fifteen months in prison for this defendant would make a laughing stock of the concept of justice. If the United States is to continue its tradition of an independent judiciary[1] unfettered by the

---

1. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78, 2 L.Ed. 60 (1803) (Marshall, J.) (interpretation of state and Federal constitutions is role exclusive to judicial branch); *see also United States v. Mendoza*, No. CR–03–730 DT, slip op. at 12 (C.D.Cal. Jan. 12, 2004)

political branches, federal trial judges familiar with the facts and humanity involved in a particular case must have some modicum of discretion to depart upwardly or downwardly in those relatively rare instances where the sentencing guidelines do not work. *See 2003 Year–End Report on the Federal Judiciary by Chief Justice William H. Renquist,* SUPREME COURT OF THE U.S. (Public Information Office, Washington, D.C.), Jan. 1, 2004, at 2. This is one of those cases. For reasons stated below, the Court assessed a term of imprisonment of 120 months as set forth in the Court's judgment of December 23, 2003, though the maximum statutory punishment could have been 360 months. *See* 18

(reporting requirement of Feeney Amendment "chills and stifles judicial independence" to extent it is constitutionally prohibited).

2. SENATE COMM. ON HEALTH, EDUC., LABOR & PENSIONS, *Financial Abuse and Exploitation, Executive Session Hearing Before the Subcomm. on Aging,* (Oct. 30, 2003) (statement of J. Joseph Curran, Jr., Attorney General, State of Maryland) (financial exploitation of elderly is particularly egregious because seniors rely heavily on others to provide them with accurate and truthful information about their financial and investment options); *Id.* (statement of Carol Scott, President, National Association of Long Term Care Ombudsman) (elderly victims are especially vulnerable to the growing crisis of financial abuse); *Id.* (statement of Robert Blancato, President, National Committee for the Prevention of Elder Abuse) (impact of financial abuse and exploitation is particularly great on elderly, who cannot replace lost assets through work, savings, or investment); *Id.* (statement of W. Lee Hammond, Board Member, American Association of Retired Persons) (older persons are especially vulnerable targets for increasing problem of financial exploitation because of physical or cognitive impairments; moreover, they are more likely to be home during the day when fraud perpetrators operate, they have relatively large amounts of readily accessible cash on hand or in checking accounts, and are less likely to take action against perpetrators); SENATE COMM. ON THE JUDICIARY, *Elder Abuse, Neglect and Financial Exploitation Hearing*

U.S.C. § 1344 (bank fraud).

## I. BACKGROUND

### A. THE VICTIM

Doris Ruth Carson is an elderly lady, slight in stature, who appeared to the Court to weigh perhaps a hundred pounds dripping wet. She survived the Great Depression, World War II, child birth and frugally saved as members of her generation often do for her later years so as not to be a burden on her children. But she did not financially survive the fiscal invasion and monetary assault upon her by her very own next door neighbors whom she trusted; and who repaid that trust by effectively stealing her identity, a frequent and sad commentary on modern society.[2]

*Before the Crime, Corrections and Victims' Rights Subcomm.,* (Sept. 24, 2003) (statement of Christopher D. Chiles, Vice President.) National District Attorney's Association (increasingly vast numbers of elderly citizens endure financial devastation by trusted caretakers or family members); (statement of Lori Stiegel, Associate Staff Director, American Bar Association) (financial abuse is growing problem which is particularly destructive to elderly Americans); *Id.* (statement of Senator Patrick Leahy) (elderly abuse, including financial exploitation, is epidemic situation which has not received the attention it deserves); *Id.* (statement of Joseph R. Biden, Jr., Member, Senate Committee on the Judiciary) (noting statistics indicate official elder abuse reports rose 150 percent between 1986 and 1996, showing that elderly are particularly susceptible to victimization); SPECIAL COMM. ON AGING, *Schemers, Scammers and Sweetheart Deals; Financial Predators & the Elderly* (January 7, 2004) (Opening Statement of Chairman Breaux) (discussing most-recent 1998 National Elder Abuse Incidence Study, mandated by Congress, determining that 30 percent of all reported and substantiated elder abuse cases were financial exploitation while 25 percent were physical abuse); *see also* NATIONAL ASS'N. OF ADULT PROTECTIVE SERVS. ADM'RS, SURVEY REPORT: STATE ADULT PROTECTIVE SERVICES PROGRAM RESPONSES TO FINANCIAL EXPLOITATION OF VULNERABLE ADULTS (July 2003) (financial exploitation of elderly was to be "the crime of the 90s," but continues to grow in seriousness and

## B. THE DEFENDANTS

Many of the elderly are fortunate to live next door to caring younger people who keep an eye out for their well being. Mrs. Carson's financial security blanket for her last years has been ripped asunder by her next door neighbors who kept their eyes, and hands, on Mrs. Carson's money. These diabolical crooks are Georgene Andrews and her son George Lawrence Andrews. Before this Court had an opportunity to sentence Georgene Andrews, she died and will therefore have to face whatever karmic or spiritual punishment awaits her. Perhaps Dante's Eighth Circle would be apropos. DANTE ALIGHIERI, THE DIVINE COMEDY (The Inferno) Canto XXX (1321) (falsification of coins or in this instance falsification of checks).

Defendant Larry Andrews is a strapping, six foot two inch tall 220 pound twenty eight year old who, before he was incarcerated, worked as a plumber's apprentice at his uncle's plumbing company and had minimal living expense by virtue of staying with his grandfather.

## II. REASONS FOR UPWARD DEPARTURE

### A. LACK OF ACCEPTANCE OF RESPONSIBILITY

Even though defendant pleaded guilty, the Court finds he has not completely accepted responsibility:

1. Notwithstanding his youthful physical stature and ability to work and lack of any significant expenses, defendant Larry Andrews, unlike some financial crime defendants this Court has sentenced and bestowed modest downward departures upon, provided nary a thin dime nor wooden nickel in restitution to Mrs. Carson. The Court has little doubt that very capable defense counsel advised Mr. Andrews of the advisability of showing remorse through a reasonable effort to accumulate some repayment prior to sentencing.

2. During the Court's colloquy with Mr. Andrews at his guilty plea and at his sentencing, it was clear Mr. Andrews conveniently sought to use the untimely death of his mother as an opportunity to minimize his own conduct, blame it on his mother for leading him astray and wiggle out of his own responsibility. This Court is reminded of a comedian from years back, as Mr. Andrews seemed to be saying: "The Devil made me do it." [3]

3. Though Mr. Andrews' lips were moving with words of remorse during his sentencing, this Court observed a lack of sincerity in Mr. Andrews' demeanor. Moreover, at his guilty plea this Court asked Mr. Andrews if he knew the definition of "righteous indignation." Mr. Andrews indicated he did not, and it was clear at the subsequent sentenc-

numbers well into 2003); *see also* Jon Nordheimer *A New Abuse of the Elderly: Theft by Kin and Friends*, N.Y. TIMES, December 16, 1991, A1, 16 (decade-old front-page article in New York Times describing financial abuse of elderly as "the crime of the 90s"); U.S. DEPT. OF HEALTH & HUMAN SERVS: FINAL REPORT (September 1998) (financial victimization of persons ages sixty-five or older steadily increasing); NATIONAL CTR. ON ELDER ABUSE: ELDER ABUSE INFO. SERIES NO. 1 (May 1996, updated March 1999) (from 1986 to 1999 there has been steady increase in reporting incidents of elder abuse, including financial victimization, nationwide); NATIONAL CTR. ON ELDER ABUSE: ELDER ABUSE INFO. SERIES No. 2 (May 1996, updated November 1997) (of hundreds of thousands of elder abuse cases, only one out of fourteen is reported to authorities).

3. Comedian Flip Wilson made this phrase popular while portraying TV character "Geraldine" on "The Flip Wilson Show," which aired from 1970 to 1974.

ing date that Mr. Andrews still had not divined the meaning of the phrase. Perhaps reading this opinion will help him learn. *Matthew* 22:39 is also instructive. The only way Mr. Andrews could have exacerbated his crime would have been to defraud his own grandmother.

## B. OTHER PUNISHMENT CONSEQUENCES NOT PRESENT

Though the Court sometimes wonders why well educated and privileged but corrupt corporate and financial criminals seem to be treated more leniently than the poor and disenfranchised under the sentencing guidelines, the Court recognizes there are consequences imposed on those defendants which in their minds at least are worse than jail; e.g. loss of mega income, removal of professional licenses and political power, forfeiture of mansions and limousines and, horror of all horrors, being booted from the country club and losing other indicia of social status. Indeed, the Court suspects some defendants would accept twice as long in prison if he or she could return to his or her previous position and lifestyle. *See United States v. Kimmel*, SA–01–CR–376–FB (W.D.Tex. Aug. 13, 2002); *United States v. Pettigrew*, No. SA–93–CR–62(7)–EP (W.D.Tex. Feb. 23, 1998); *United States v. Bustamante*, No. SA–93–CR–39(1)–EP (W.D.Tex. Sept. 12, 1997). Those elements of punishment and loss are not present here.

## C. COMPARISON TO OTHER DEPARTURES BY THIS COURT

The vast majority of departures are because of assistance to law enforcement by a defendant, first offender "safety valve" considerations and United States/Mexico border cases involving deportation factors and enormous caseloads. U.S. GEN. ACCOUNTING OFFICE REPORT, FEDERAL DRUG OFFENSES: DEPARTURES FROM SENTENCING GUIDELINES AND MANDATORY MINIMUM SENTENCES, FISCAL YEARS 1999–2001 (No. GAO–04–105) (Oct.2003) (of federal sentences for drug-related offenses, downward sentencing departures were more frequently due to prosecutors' substantial assistance motions (twenty-eight percent) than for any other reasons (sixteen percent)); U.S. SENTENCING COMM'N, REP. TO CONGRESS: DOWNWARD DEPARTURES FROM THE FED. SENTENCING GUIDELINES 31, 59, 60 (Oct.2003) (concluding downward departure rate was 18.1 percent in fiscal year 2001, and approximately forty percent of downward departures granted in 2001 were government initiated; if all government initiated downward departures were excluded, departure rate would be 10.9 percent).

The minuscule number of judge driven departures by this Court includes upward punishment in *United States v. Cerda & Lopez*, No. SA–01–CR–643–FB (W.D.Tex. July 7, 2002), *aff'd*, No. 02–50634 (5th Cir. April 23, 2003) and *United States v. Delossantos*, No. SA–01–CR–240(1)–FB (W.D.Tex. Aug. 22, 2002), *aff'd*, 85 Fed. Appx. 398, 2004 WL 96778 (5th Cir.2004), and downward adjustment in *United States v. Bart*, 973 F.Supp. 691 (W.D.Tex. 1997) (no appeal by the United States), and *United States v. Navarro*, No. SA–01–CR–333(1)–FB (W.D.Tex. Apr. 15, 2002) (no appeal by the United States). The facts here put defendant Andrews in the firmament with defendants Cerda, Lopez and Delossantos, not with defendants Bart, Stewart and Navarro.

## D. COMPARISON OF SENTENCES IN FINANCIAL CRIMES WITH GUIDELINE PUNISHMENT IN LOW LEVEL DRUG OFFENSES

This Court has sentenced thousands of people whose federal crime was to be the "mule" supplying America's insatiable de-

mand for illegal substances and cheap labor, or to support their own addiction. Many are motivated by a desire to feed and provide health care for their families. One non-U.S. citizen defendant whom the Court vividly recalls had always been a productive law-abiding person until in middle age he needed $300 to buy a casket for his six year old child. Yet the sentencing guidelines required him and thousands like him to spend eighteen to thirty months in prison before deportation. Defendant Andrews' crime is far worse and deserves far more punishment than the guidelines suggest.

## III. THE LEGAL STANDARD USED BY THE COURT

In addition to the Court's experience and opportunity to hear the defendant and victim and the particular facts created by Andrews' greed, as opposed to a paper record or a statistical congressional study, the Court has given due deference and consideration to applicable legislative enactments, sentencing commission pronouncements and appellate cases. *See e.g.*, 18 U.S.C. §§ 3551–3673, 28 U.S.C. §§ 991–998 (legislation authorizing creation of sentencing guidelines); U.S. SENTENCING GUIDELINES MANUEL (2003) (sentencing guidelines and commentary); *Mistretta v. United States*, 488 U.S. 361, 412, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (upholding constitutionality of Sentencing Commission and guidelines).

## IV. CONCLUSION

Within the parameters of the rules of law cited, and our revered concepts of checks and balances and separation of powers, ultimately one human being must don a black robe and sit in judgment of another. It is an art—not a science to be imposed by computerized formulae and statistics. It is the constitutional duty of the judicial branch to practice that art conscientiously, courageously and independently of our legislative and executive friends and colleagues. Indeed, the Court has had an occasional case where those who supported longer prison terms and circumscribed judicial discretion had a change of the human heart when their friend or loved one was perceived to be living a Kafkaesque/Orwellian Guideline Nightmare. *United States v. Kimmel*, SA–01–CR–376–FB (W.D.Tex. Aug. 13, 2002); *United States v. Barnes*, No. DR–00–CR–599(1)–FB (W.D.Tex. May 23, 2001). Behold, the Ox returns.[4]

Those who prey upon the elderly, and the financially unsophisticated who hope to become elderly with secure pensions, do greater economic damage and scar the social contract far more deeply than petty criminals serving longer sentences. They are often those to whom much opportunity and education have been given and of whom much better is expected. They corrupt their opportunities and education not to satisfy a physiological craving, but greedily to accumulate and consume, and to worship at the altar of ill-gotten wealth.

---

**4.** "A Farmer came to a neighboring Lawyer, expressing great concern for an accident which he said had just happened. One of your Oxen, continued he, has been gored by an unlucky Bull of mine, and I should be glad to know how I am to make you reparation. Thou art a very honest fellow, replied the Lawyer, and wilt not think it unreasonable that I expect one of thy Oxen in return. It is no more than justice quoth the Farmer, to be sure; but what did I say?—I mistake—It is *your* Bull that has killed one of *my* Oxen. Indeed says the Lawyer, *that alters the case:* I must inquire into the affair; and if—*And If!* said the Farmer—the business I find would have been concluded without an *if*, had you been as ready to do justice to others as to exact it from them." Noah Webster, The American Spelling Book 101–02 (Hartford, Hudson & Goodwin 1788)(italics emphasis in original; underline emphasis added).

DANTE ALIGHIERI, THE DIVINE COMEDY (The Inferno) Canto VII (1321) (Fourth Circle of Dante's Inferno is occupied by the Avaricious, whose sin is excessive greed). They need to receive a message: The punishment will fit the crime.

The Court finds 120 months fits defendant Andrews.

It is so ORDERED.